1  René P. Voss (CA Bar No. 255758)
   15 Alderney Road
2  San Anselmo, CA 94960
3  Phone: (415) 446-9027
   Email: renepvoss@gmail.com
4  LEAD COUNSEL

5  Rachel S. Doughty (CA Bar No. 255904)
   GREENFIRE LAW, PC
6  1202 Oregon Street
7  Berkeley, CA 94702
   Phone: (828) 424-2005
8  Email: rdoughty@greenfirelaw.com

9  *Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| SEQUOIA FORESTKEEPER, <br><br> Plaintiff, <br><br> v. <br><br> ERIC LA PRICE, in his official capacity as District Ranger for the Western Divide Ranger District of the Sequoia National Forest; ALFRED WATSON, in his official capacity as District Ranger for the Kern River Ranger District of the Sequoia National Forest; KEVIN ELLIOTT, in his official capacity as Forest Supervisor of the Sequoia National Forest; and the UNITED STATES FOREST SERVICE, <br><br> Defendants. | No.: <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*) |

1

**INTRODUCTION**

1. This is a civil action for declaratory and injunctive relief, which stems from Federal Defendants' (the Forest Service's) ongoing actions related to two projects, which permit commercial logging and other activities in core habitat for the Pacific fisher in the Greenhorn Mountains of the Sequoia National Forest—the Frog Timber Sale Project ("Frog Project") and the Rancheria Forest Restoration Project ("Rancheria Project"). Logging and other activities could start as early as July 1, 2016, in the Rancheria Project area and August 1, 2016, in the Frog Project area, which mark the end of limited operating periods for Pacific fishers and American marten, respectively, to rear their young.

2. Plaintiff seeks a declaration that the Forest Service has violated federal laws by proceeding with implementation of the Frog and Rancheria Projects without analyzing significant new circumstances and scientific information about the effects of project activities on Pacific fishers, as necessary under the National Environmental Policy Act (NEPA). Plaintiff further asks the Court to enjoin activities proposed in the Frog and Rancheria Projects until the Forest Service has properly analyzed these significant new circumstances and scientific information, which show that these projects and other cumulative actions affect the Pacific fisher in a manner and to an extent not previously considered. In addition, Plaintiff asks the Court to order the Forest Service to supplement its NEPA analyses, and because these effects on fishers are significant, to order the Forest Service to prepare Environmental Impact Statements (EIS') for the Frog and Rancheria Projects.

3. The Pacific fisher is listed as a Forest Service "Sensitive Species," which include those plants and animals whose population viability is in question. Only about 300 individual fishers remain in an isolated population in the Southern Sierra Nevada, constituting the southern-most extent of the fisher's range. A substantial number of these remaining fishers make their home in the Greenhorn Mountains of the Sequoia National Forest, which is where the Frog and Rancheria Project areas are located.

4. The Forest Service issued its original Frog Timber Sale Project decision in 2001. It since revised the project, which allows logging on 1,436 acres, including 855 acres of core

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 2

fisher habitat. In 2006, Judge Charles R. Breyer of the Northern District of California permanently enjoined implementation of the Frog Project, as well as several other logging projects in the Greenhorn Mountains (Ice Tractor, Saddle, Ice Helicopter, and White River), until the Forest Service adequately demonstrated that it had considered significant new information about the projects' effects on Pacific fisher and its habitat. New information at the time included the proposal that the fisher could be listed as threatened under the Endangered Species Act, the new Giant Sequoia National Monument Management Plan standards, and basic information about the effects from management activities on the fisher, none of which had been considered. The new information about the effects from management activities then is substantially different than the significant new information about the effects from the rate of implementing those management activities, which are the subject of this complaint.

5. In 2013, after the agency analyzed basic information about the Frog Project's effects on fishers in a revised Environmental Assessment (EA), Judge Breyer lifted his injunction. The timber contractor began logging some of the Frog units in 2015, although logging has not been completed in a substantial number of units. Logging in the Frog Project area could resume as early as August 1, 2016, the end of the limited operating period.

6. The Forest Service conducted an environmental analysis between 2011 and 2012, and issued its decision to proceed with the Rancheria Project in 2013. The decision allows treatments, including commercial logging, over 5,879 acres, including 4,509 acres of core Pacific fisher habitat. Logging and other activities in the Rancheria Project area have not yet begun, but may start as soon as July 1, 2016, the end of the limited operating period.

7. In addition to the Frog and Rancheria Projects, the Forest Service has specific plans for several other large thinning, logging, and burning projects in the Greenhorn Mountains, including the Tobias, Summit, and Summit CE Projects. The Forest Service has already completed plans for several other similar large projects, including the White River, Saddle, Ice Tractor, Ice Helicopter, and Red Mountain Projects. Combined, the White River, Saddle, Ice Tractor , Ice Helicopter, Red Mountain, Tobias, Summit, Summit CE, Frog, and Rancheria projects would log, thin, or otherwise treat over 20,000 acres of core Pacific fisher habitat in the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 3

Green Mountains. *See* Figure below (labeled "Map 9"). The White River, Saddle, and Ice Helicopter projects are located in the adjacent Giant Sequoia National Monument, and remain enjoined by Judge Breyer's court order. So far, the Forest Service has only completed the Ice Tractor, Red Mountain, and parts of the Frog Projects.



Map 9: Project vicinity map with other projects identified within the southern Sierra fisher sup-population level.

8. Together, these activities are likely to significantly affect the Pacific fisher in a manner and extent the Forest Service has not previously considered, based on the Forest Service's own scientific research, which reports that Pacific fishers can only tolerate a limited amount of logging and restorative treatments, such as thinning and burning, at a rate of about 2.6% of its habitat per year. Additional research has found that fishers avoid thinned areas. Thinning, logging, and other treatment proposals have the potential to impede fisher migration

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    4

through the central portion of the Greenhorn Mountains and would likely have drastic effects on the genetic exchange of fishers in an area where the species' genetic diversity is at its highest.

9. This new science, the Zielinski et al. (2013b) Fisher Tolerance Study, concludes that managers must factor in the extent and rate of logging, thinning, and restorative treatments to determine whether fishers can tolerate the planned activities, also ensuring that habitat connectivity is maintained. The Forest Service has neither analyzed the extent or rate of treatments nor the connectivity of habitat for fishers in the Frog or Rancheria Projects. Failure to consider this significant new information violates NEPA.

10. The Forest Service's new *Southern Sierra Nevada Pacific Fisher Conservation Strategy* (Fisher Conservation Strategy), finalized in February of 2016, specifically references the Zielinski et al. (2013) Fisher Tolerance Study and has incorporated its management recommendations, which suggest that the Forest Service's analysis consider the rate of treatments on fisher habitat when planning and implementing thinning, logging, and restorative project activities.

11. Expert analysis, based on the Fisher Tolerance Study, shows that the Forest Service's activities proposed in the various projects in the Greenhorn Mountains will likely exceed the rate of treatments that fishers will tolerate, thereby displacing fishers from some of their best habitat. Moreover, expert analysis finds that the fisher's avoidance of logged and thinned areas will likely impede or cut off fisher migration through the central portion of the Greenhorn Mountains.

12. The Projects are inconsistent with the Fisher Conservation Strategy's management recommendations, because, among other things, the Forest Service failed to analyze the Projects' individual and cumulative rate of treatments in fisher habitat.

13. In addition, over the last few years, as a result of the drought in California, many thousands of trees in the Sequoia National Forest have succumbed to insect infestations and have died, affecting the national forest areas in the Greenhorn Mountains, including the Frog and Rancheria Project areas. This massive die-off of trees has negatively affected habitat for Pacific fishers in the Frog and Rancheria Project areas. These changes to the fishers' habitat constitutes

a significant new circumstance that has not been and must be considered in the projects' NEPA analyses.

14. Because the cumulative effects from the various projects in the Greenhorn Mountains combined with the massive tree die-off will have significant adverse effects on the Pacific fisher, the Forest Service cannot rely on its existing EAs and must prepare full Environmental Impact Statements before proceeding with implementation of the Frog and Rancheria Projects.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701 et seq. (Administrative Procedure Act) and 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act). Plaintiff has exhausted all administrative remedies and the violations of law claimed below are ripe for judicial review.

16. Venue lies in the Eastern District of California, pursuant to 28 U.S.C. § 1391(e), because the property and events giving rise to this suit occur in this District and because Plaintiff Sequoia ForestKeeper resides within the District.

17. An actual judiciable controversy exists between the parties hereto.

## INTRADISTRICT VENUE

18. Similarly, because a substantial part of the events or omissions, which give rise to the claims herein, occurred in Kern and Tulare Counties, assignment to the Fresno Division of this Court is proper under Civil Local Rule 120(d).

## PARTIES

19. Plaintiff SEQUOIA FORESTKEEPER is a non-profit corporation residing in Kernville, California. Its mission is to protect and restore the ecosystems of the Southern Sierra Nevada, including, but not limited to, the Giant Sequoia National Monument, Sequoia National Forest, and Mountain Home State Forest through monitoring, enforcement, education, and litigation. Sequoia ForestKeeper's members, many of whom reside in local areas including Kern, Tulare, Fresno, and Kings Counties, and others who visit from across the country, use the forests of the Southern Sierra Nevada for activities such as hiking, bird and animal watching,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                       6

| | |
|---|---|
| 1 | aesthetic enjoyment, quiet contemplation, fishing, scientific study, and to improve their health. |
| 2 | Many of its members also have been actively involved in formulating management policies for |
| 3 | public lands and preserving local areas, including participating in the establishment and |
| 4 | development of the Giant Sequoia National Monument. |
| 5 |     20.    The Forest Service's continued implementation of the Frog and Rancheria |
| 6 | Projects is in contravention of the National Environmental Policy Act (NEPA).  Some of Sequoia |
| 7 | ForestKeeper's members have used and enjoyed the exact tracts of forest and lands where the |
| 8 | projects are occurring, with specific plans to return.  They will be directly harmed by these |
| 9 | projects as approved and as currently planned for implementation by the Forest Service.  If the |
| 10 | Forest Service were to comply with NEPA it would supplement its environmental analyses and |
| 11 | prepare Environmental Impact Statements (EIS') to consider the significant effects from these |
| 12 | and the various other projects on the Pacific fisher, considering additional alternatives to its |
| 13 | proposed actions, and would minimize or avert the harm to Plaintiff's members that will be |
| 14 | caused from the logging of trees and destruction of wildlife habitat by the proposed actions. |
| 15 |     21.    Defendant ERIC LA PRICE is sued in his official capacity as the District Ranger |
| 16 | of the Western Divide Ranger District of the Sequoia National Forest of the United States Forest |
| 17 | Service where the Frog Project is located.  The District Ranger is responsible for decisions |
| 18 | implementing forest management activities in the Western Divide Ranger District of the Sequoia |
| 19 | National Forest.  Moreover, the District Ranger is responsible for the work and activity of all |
| 20 | staff and personnel assigned to the Western Divide Ranger District and has authority to direct |
| 21 | and control their actions, including the actions sought in this Complaint. |
| 22 |     22.    Defendant ALFRED WATSON is sued in his official capacity as the District |
| 23 | Ranger of the Kern River Ranger District of the Sequoia National Forest of the United States |
| 24 | Forest Service where the Rancheria Project is located.  The District Ranger is responsible for |
| 25 | decisions implementing forest management activities in the Kern River Ranger District of the |
| 26 | Sequoia National Forest.  Moreover, the District Ranger is responsible for the work and activity |
| 27 | of all staff and personnel assigned to the Kern River Ranger District and has authority to direct |
| 28 | and control their actions, including the actions sought in this Complaint. |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    7

23. Defendant KEVIN ELLIOTT is sued in his official capacity as the Forest Supervisor of the Sequoia National Forest of the United States Forest Service. The Forest Supervisor is responsible for decisions implementing forest management activities for the Sequoia National Forest. Moreover, the Forest Supervisor is responsible for the work and activity of all staff and personnel assigned to the Sequoia National Forest and has authority to direct and control their actions, including the actions sought in this Complaint.

24. Defendant UNITED STATES FOREST SERVICE is a federal government agency within the Department of Agriculture, which holds the National Forests in trust for the American people and is responsible for actions in the Frog and Rancheria Project areas.

## FACTS

The Frog and Rancheria Project Areas and the Greenhorn Mountains

25. The Frog and Rancheria Project areas are located in Tulare and Kern Counties in the Greenhorn Mountains of the Sequoia National Forest, just north and south of the community of Alta Sierra, California.

26. The Greenhorn Mountains are a narrow mountain ridge, which runs roughly north-south and is draped by mixed conifer forest cover varying from one to two miles wide. This mixed conifer forest corridor provides essential wildlife habitat, hiding cover, and a key north-south migration corridor for forest-dependent wildlife, especially the Pacific fisher.

27. Over the last few years, as a result of the drought in California, many thousands of trees in the Greenhorn Mountains have succumbed to insect infestations and have died, including in the Frog and Rancheria and other fisher habitat areas.

The Pacific Fisher

28. The Pacific fisher (*Pekania pennanti*) is a forest-dwelling mammal in a family that includes weasels, mink, martens, and otters. They are about the size of a large house-cat and are light brown to dark blackish-brown. The fisher has a long body with short legs and a long bushy tail.

29. Pacific fishers require moderate to dense forest canopy cover, avoid non-forested habitats with little or no cover, and prefer habitat with an abundance of complex forest structural

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    8

components such as trees with cavities, large down logs, and large snags (standing dead trees). Fishers are strongly associated with unfragmented, mature, and late successional (old growth) conifer and mixed hardwood conifer forests.

30. The Frog and Rancheria Projects are entirely within the southern-most portion of the Southern Sierra Fisher Conservation Area (Fisher Conservation Area). The Fisher Conservation Area encompasses the known occupied range of Pacific fishers on National Forest System land in the Sierra Nevada, and consists of an elevation band from 3,500 feet to 8,000 feet on the Sierra and Sequoia National Forests, which provides habitat for the southernmost population of Pacific fishers in the world. The Fisher Conservation Area was established to maintain and expand the fisher population of the southern Sierra Nevada. Estimates of the Southern Sierra fisher population range from 100 to 500 individual fishers, including one estimate of 300, although other estimates have found only 50 to 120 reproductive adult females in that same population.

31. The Southern Sierra Pacific fisher population is listed by the State of California as a threatened species under the California Endangered Species Act. The fisher is listed by the Forest Service as a "Sensitive Species." Sensitive species are defined as "those plant and animal species identified by a Regional Forester for which population viability is a concern as evidenced by significant current or predicted downward trend in numbers or density." Forest Service Manual 2670.32.

32. In 2014, the United States Fish and Wildlife Service (USFWS) proposed listing the fisher under the federal Endangered Species Act (ESA). 79 Fed. Reg. 60419 (Oct. 7, 2014). However, the agency recently decided not to list the entire West Coast Pacific fisher population under the Act. 74 Fed. Reg. 22710 (April 18, 2016). This leaves the possibility of listing the isolated population of the Southern Sierras as threatened under the ESA.

33. Logging, thinning, and other treatments that change forest structure or canopy cover degrade habitat for Pacific fishers. Scientific studies have found that "fishers avoided using treated areas when resting and foraging." Zielinski et al. (2013b) (citing Garner (2013)); *see also* Truex and Zielinksi (2013).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 9

34. According to the Zielinski et al. (2013b) Fisher Tolerance Study, fisher occupation of larger habitat areas begins dropping quickly when restorative treatments, which include fuel reduction thinning, prescribed fire, or pre-commercial (hand) thinning, exceed a rate of about 13% in 5 years, or an average of about 2.6% per year. Fisher use was lowest in areas where the rate of treatments was only slightly higher, that is, when 3.5% of the area has been disturbed each year. In other words, as the rate of treatment increases from 2.6% of a larger area per year, the fisher's use of the area declines, with data showing the lowest use when an area was treated at 3.5% per year. The Zielinski et al. (2013b) Fisher Tolerance Study concludes that treatment rates which exceed the 2.6% per year "may put fisher habitat and fisher use of these areas at risk."

35. The Forest Service recently finalized a *Southern Sierra Nevada Pacific Fisher Conservation Strategy* (Fisher Conservation Strategy). The Fisher Conservation Strategy includes specific direction for fisher habitat management in the Fisher Conservation Area and is based on the best available scientific information about fisher conservation.

36. The Frog and Rancheria Projects are within an area that the Fisher Conservation Strategy classifies as "Core 2." Core 2 includes the southwestern tip of the Sierra Nevada and Greenhorn Mountains—between the Kern River and Bear Creek in the Tule River watershed—mostly within the Sequoia National Forest and Giant Sequoia National Monument. It currently has the highest recorded fisher occupancy rates, highest predicted average habitat quality, and highest genetic diversity in the fisher assessment area.

37. The Fisher Conservation Strategy specifically references and incorporates the Zielinski et al. (2013b) Fisher Tolerance Study in its management recommendations:

> Design treatments to keep affected management grid cells in suitable fisher habitat condition *and* limit disturbance from mechanical treatments to <13% of the affected cells over a 5-year period (Zielinski et al. 2013b) or <25% over a 10-year period, unless treatments will not fragment fisher core or linkage areas and will better meet fisher conservation objectives. In areas at highest risk of severe fire in critical locations, up to 30% of the area may be treated over a 5-year period or up to 50% in a 10-year period, so long as the retention guidelines in Section 4.5.3 are adhered to and fisher core or linkage areas are not fragmented.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 10

38. In other words, the Fisher Tolerance Study and the Fisher Conservation Strategy suggest that managers factor in the extent and rate of logging and restorative treatments to determine whether fishers can tolerate the planned activities, also ensuring that habitat connectivity is maintained.

39. The Forest Service has neither analyzed the extent or rate of treatments nor analyzed connectivity of habitat for fishers in the Rancheria or Frog Projects' environmental analyses. Moreover, both projects, individually and cumulatively, would likely exceed the fisher's tolerance limits if implemented over a 5- to 10-year timeframe.

40. The Forest Service has not analyzed the impact of recent drought-related tree mortality on the fisher or the cumulative effects of that tree mortality and project activities on the fisher.

41. Additional significant research regarding the effects of management activities affecting fishers and their habitat has been published since the Forest Service analyzed the effects of project activities, which has not been considered and analyzed in its NEPA analyses.

42. In general, the Forest Service has failed to integrate these significant new circumstances and information into its analysis of the impacts of these projects.

Other Species that Depend on Old Growth Habitats

43. The Greenhorn Mountains include habitat for other rare, sensitive, and even endangered species, which depend on intact old-growth forests and dense forest cover for their survival. Old-growth forests in the Sierra Nevada have declined by as much as 90 percent. Species that depend on intact old-growth forests include not only the Pacific fisher, but also the California spotted owl, northern goshawk, American marten, and mountain yellow-legged frog.

44. Like its cousins the Mexican and northern spotted owls, the California spotted owl is a bellwether of old-growth forests. The California spotted owl is closely associated with habitat similar to that of the Pacific fisher. The Frog and Rancheria Project areas are located predominantly in old-growth forest and include multiple California spotted owl protected activity centers (PACs). Habitat destruction or degradation from logging and related thinning or fuel reduction activities continues to pose a significant ongoing threat to the owl. Research findings

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 11

have consistently documented a correlation between mechanical reductions in canopy cover and adverse effects to California spotted owls, similar to that proposed in the Frog and Rancheria Projects.

45. The California spotted owl is listed by the Forest Service as a Sensitive Species. The USFWS recently found that listing petitions for the California spotted owl presented substantial scientific or commercial information indicating that Endangered Species Act (ESA) listing may be warranted and is undertaking a status review of the species. 80 Fed. Reg. 56423, 56426 (Sept. 18, 2015).

46. The Greenhorn Mountains also include habitat for northern goshawks, another Forest Service Sensitive Species, which shares habitat similar to that for the Pacific fisher and California spotted owl. Northern goshawks have been recorded in the Frog and Rancheria Project areas and records indicate that they may have nested, and may be nesting there. Research findings have documented a correlation between mechanical reductions in canopy cover and adverse effects to northern goshawks, similar to that proposed in the Frog and Rancheria Projects.

47. The Greenhorn Mountains also include habitat for American marten, another Forest Service Sensitive Species, which shares habitat similar to that for the Pacific fisher, California spotted owl, and northern goshawk. American martens are found at higher elevations and their habitat is found as far south as the Frog Project area. Research findings have documented a correlation between mechanical reductions in canopy cover and adverse effects to American marten, similar to that proposed in the Frog Project.

48. The Greenhorn Mountains also contain habitat for the mountain yellow-legged frog (MYLF), listed as an endangered species under the ESA. Suitable habitat for the MYLF typically occurs above 4,500 feet in elevation to over 12,000 feet elevation. Suitable habitat includes permanent water bodies or those hydrologically connected with permanent water such as wet meadows, lakes, streams, rivers, tarns, perennial creeks, permanent plunge pools within intermittent creeks, and pools, such as a body of impounded water contained above a natural dam. Suitable habitat includes adjacent areas, up to a distance of 25 meters (82 feet). The Frog

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    12

and Rancheria Project areas are above 4,500 feet in elevation and contain the headwater of several streams where treatments are proposed. The use of heavy equipment or tree felling within the 82 feet corridor of these creeks could crush and kill frogs, and otherwise degrades their habitat.

Requests for Administrative Remedies to Supplement each NEPA Analysis

49. Even though no notice of a request to supplemental a NEPA analysis is required to bring the claims in this case, Plaintiff has made efforts to resolve the significant scientific questions posed in this case administratively.

50. In March 2014, Plaintiff sent a letter asking the Forest Service to re-analyze the Frog and Rancheria Projects based on new studies not considered in each project's respective NEPA analysis. In a letter dated May 14, 2014, Forest Service Kevin Elliott responded, asserting that the agency did not need to supplement its NEPA analysis, suggesting that most of the information had already been considered or was not significant enough to postpone project implementation.

51. At that time, Plaintiff was not aware of the Zielinski et al. (2013b) Fisher Tolerance Study, which only came to light based on research that Plaintiff's counsel conducted in the fall of 2015 when reviewing the draft Fisher Conservation Strategy. After estimating the projected rate of logging in the various projects, Plaintiff discovered that both projects, individually and cumulatively, would likely exceed the fisher's tolerance limits if implemented over a 5- to 10-year timeframe.

52. Based on those calculations, Plaintiff sent a second letter on January 11, 2016, again requesting that the Forest Service re-analyze the Frog and Rancheria Projects and supplement their NEPA analyses based on the tolerance and connectivity issues in the Zielinski et al. (2013b) Fisher Tolerance Study. Plaintiff presenting its calculations and also asserted that the Forest Service failed to adequately respond to the issue of fisher avoidance of thinned areas, based on the Garner (2013) study, which Plaintiff provided with the first letter.

53. In a letter dated January 22, 2016, Forest Supervisor Kevin Elliott, stated that the Forest Service would provide a formal response. But after more than three months the Forest

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 13

Service had not responded to Plaintiff's request. So, on April 25, 2016, Plaintiff's counsel sent an e-mail request to Mr. Elliott asking for an update on the Forest Service's promised response and alternatively suggested a meeting to discuss the issues presented by the letters.

54. As of the date of this Complaint, the Forest Service has not provided any substantive response to Plaintiff's requests.

The National Environmental Policy Act

55. Congress enacted the National Environmental Policy Act "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

56. To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental impacts of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement is commonly known as an environmental impact statement ("EIS"). The EIS must describe the adverse environmental effects of the proposed action and alternatives to the proposed action. *Id.*

57. The Council on Environmental Quality (CEQ) has promulgated regulations implementing NEPA, which are binding on all federal agencies. 40 C.F.R. § 1507.1. The CEQ regulations establish additional requirements for environmental impact statements. 40 C.F.R. § 1508.9.

58. To determine whether a proposed action significantly affects the environment, the agency must consider both the context and intensity of the proposed action, including whether the project will take place in "ecologically critical areas," whether it will affect endangered species, whether the effects of the project are highly controversial or uncertain, and whether the project is related to other actions with individually insignificant but cumulatively significant impacts. 40 C.F.R. § 1508.27.

59. To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the acting agency may first prepare an Environmental Assessment (EA). 40 C.F.R. § 1508.9. An EA must provide sufficient evidence and analysis to determine whether to prepare an EIS. *Id.* If the agency concludes that a project may have significant impacts on the environment, it must prepare an EIS. 40 C.F.R. § 1501.4. If the EA concludes that there are no significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a "finding of no significant impact" (FONSI). 40 C.F.R § 1508.13.

60. The EIS process is intended "to help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment" and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b)-(c). The EIS must "provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

61. An EIS must evaluate the significance of the direct and indirect environmental effects of the proposed action, as well as any conflicts between the proposed action and other federal, state or local laws or policies for the same geographic area. 40 C.F.R. § 1502.16, 1506.2.

62. NEPA requires that an EIS consider the cumulative impacts of the proposed federal agency action together with past, present and reasonably foreseeable future actions, including all federal and non-federal activities. 40 C.F.R. § 1508.7. Cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present or reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

63. NEPA requires that the agency use the best available data and ensure the scientific integrity of an EIS, disclose opposing scientific viewpoints, and follow specified procedures to address gaps in data and scientific uncertainty. 40 C.F.R. §§ 1500.1, 1502.9, 1502.22, 1502.24.

64. Agencies must circulate an EIS for public comment and must respond meaningfully to comments. 40 C.F.R. Part 1503.

65. A federal agency must prepare supplemental NEPA documents to evaluate "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). Once it is determined that a supplemental NEPA document is required, the document must be prepared and circulated to the public and other agencies in the same fashion as the initial document. 40 C.F.R. § 1502.9(c)(4).

66. The Forest Service's internal policies embody the rule for supplemental NEPA analysis. Under the Forest Service Handbook (FSH) 1909.15, Ch. 10, § 18.1, an official must carefully assess and document the importance of any new information or changed circumstances that relate to the environmental impacts of a project. Only if that official determines that a correction, supplement, or revision to an environmental document is not necessary, and this result is documented in the appropriate program or project file, should implementation of the project be allowed to continue. *Id*.

67. If in reviewing the importance of new information or circumstances the official decides that an Environmental Assessment (EA) must be changed to address new information or circumstances, the EA should be appropriately revised. *Id.* Ch. 10, § 18.4. If a Finding of No Significant Impact (FONSI) was previously issued, section 18.4 prescribes that the official must do one of two things: (1) the FONSI can be reissued with an explanation as to why the new considerations will not lead to the project having a significant impact on the environment; or (2) if the new considerations may contribute to the project having a significant impact on the environment, a notice of intent to prepare an EIS should be issued. *Id.*

*//*

*//*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 16

## CLAIM FOR RELIEF

### National Environmental Policy Act (NEPA) Violations

68. The paragraphs above are incorporated herein by reference.

69. The ongoing or imminent implementation of the Frog and Rancheria Projects, years after they underwent environmental review, violates NEPA's requirements and Defendants' own policies for ongoing review of significant new information or changed circumstances bearing on the projects' environmental effects.

70. By proceeding without further analysis, Defendants Eric La Price, Alfred Watson, Kevin Elliott, and the U.S. Forest Service are or will be implementing the Frog and Rancheria Projects in violation of NEPA, 42 U.S.C. §§ 4321, *et seq.*, and its implementing regulations.

71. When "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" is presented (40 C.F.R. § 1502.9(c)(1)(ii)), Defendants must prepare a supplemental NEPA analysis.

72. A Federal agency has an ongoing duty to take a hard look at any significant new information, in a timely manner, to determine whether the agency's action, individually or cumulatively, could result in significant adverse effects on the environment. *See Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 559 (9th Cir. 2000). An agency cannot rest on the conclusions made in an Environmental Assessment (EA), but instead maintains a continuing obligation to take a "hard look at the environmental effects of its planned action, even after a proposal has received initial approval." *Marsh v. Oregon Nat. Res. Council,* 490 U.S. 360, 374 (1989). That continuing duty further requires a federal agency to gather and evaluate new information relevant to the environmental impacts of its actions and then "make a reasoned determination whether it is of such significance as to require implementation of formal NEPA filing procedures." *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1023, 1024 (9th Cir.1980). Defendants have failed to evaluate this new information in a timely manner and have also failed to make a reasoned determination of its significance.

73. The Frog and Rancheria Projects plainly require supplemental environmental review in light of new circumstances and scientific information. In the years since the Frog and

Rancheria Projects were initially approved, additional major federal actions immediately adjacent to these projects have been proposed and recent scientific studies have shown that the manner and extent of impacts from these activities on Pacific fishers have changed. Moreover, many thousands of trees have died throughout each project area, which has changed the fishers' habitat. Finally, additional significant research regarding the effects of management activities affecting fishers and their habitat has been published since the Forest Service analyzed the effects of project activities, which has not been considered and analyzed in its NEPA analyses. Yet defendants have begun implementing the Frog Project and plan to imminently begin implementing the Rancheria Project based on now obsolete environmental assessments and their plainly erroneous findings that the projects will have no significant effect on the environment.

74. Moreover, an Environmental Impact Statement (EIS) "*must* be prepared if substantial questions are raised as to whether a project ... *may* cause significant degradation of some environmental factor." *Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1149 (9th Cir.1998) (emphasis in original); *see also id.* at 1150 (noting that a plaintiff need not show that "significant effects *will in fact occur,*" but rather must show that there are "substantial questions whether a project may have a significant effect.") (emphasis added). The U.S. Supreme Court has held that a supplemental EIS should be prepared if: (1) "there remains 'major Federal actio[n]' to occur," and (2) "if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered." *Marsh v. Oregon Nat. Res. Council,* 490 U.S. 360, 374 (1989).

75. Major Federal actions remain, since the Frog and Rancheria Projects have not been fully implemented. And in light of the significant new circumstances about tree mortality and new information about effects from thinning and other activities on Pacific fishers—the Zielinski et al. (2013b) Fisher Tolerance Study, which finds that fishers only tolerate restorative activities at a specific rate, and the Garner (2013) paper, which concludes that fishers avoid thinned areas—the Frog and Rancheria Project analyses fall short of NEPA's legal requirements because the projects will affect the quality of the human environment in a manner or to a significant extent not already considered.

76. The Forest Service's determinations that the projects will not have significant effects are no longer valid because the new studies and new circumstances show that the proposed activities will either significantly affect Pacific fishers or, at the least, raise substantial questions whether the projects may have significant effects on the environment.

77. By their failure to supplement their analyses and failure to prepare Environmental Impact Statements in compliance with NEPA, Defendants have taken final agency actions that are arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2). As such, Defendants' actions should be held unlawful and set aside. *Id.* And because Defendants have failed to act when they have a duty to act, the Court should compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

**REQUEST FOR RELIEF**

For these reasons, Plaintiff requests that the Court:

a) Declare that the Frog and Rancheria Projects violate NEPA;

b) Compel Defendants to supplement their NEPA analyses and prepare Environmental Impact Statements;

c) Enjoin Defendants from selling, felling, and removing any trees or implementing any other project activities in the Frog and Rancheria Project areas until they have supplemented their NEPA analyses and prepared Environmental Impact Statements;

d) Award Plaintiff its costs of litigation, including reasonable attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

e) Provide such other relief as the Court deems just and proper.

Respectfully submitted this 1st day of June, 2016.

_____

René Voss
Rachel S. Doughty, Greenfire Law, PC

*Attorneys for Plaintiff*