# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEQUOIA FORESTKEEPER,<br><br>        **Plaintiff**<br><br>        **v.**<br><br>ERIC LA PRICE, in his official capacity as District Ranger for the Western Divide Ranger District of the Sequoia National Forest, et al.,<br><br>        **Defendants, and**<br><br>SIERRA FOREST PRODUCTS, a California Corporation,<br><br>        **Intervenor-Defendant** | CASE NO. 1:16-CV-0759 AWI JLT<br><br>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT; PLAINTIFF'S MOTION TO ADMIT EXTRA-RECORD EVIDENCE; DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S EXTRA-RECORD EVIDENCE; AND PLAINTIFF'S MOTION TO STRKE THE DECLARATION OF JEFFREY R. CORDES<br><br>(Doc. Nos. 47, 48, 51, 52, 53, 56) |

This is a National Environmental Policy Act ("NEPA") and National Forest Management Act ("NFMA") case filed by Plaintiff Sequoia Forest Keeper ("SF Keeper" or "Plaintiff") against the United States Forest Service ("Forest Service") and various Forest Service employees in their official capacities (collectively, "Defendants") to halt the Frog Timber sale Project ("Frog Project" or "Frog").  Sierra Forest Products ("SF Products"), the corporation with the contract to carry out the Frog Project, is an Intervenor-Defendant. SF Keeper has brought a civil action for declaratory and injunctive relief, which stems from Defendants' ongoing actions related to the Frog Project, permitting commercial logging and other activities in what SF Keeper maintains is core habitat for the Pacific Fisher ("Fisher") in the Greenhorn Mountains of the Sequoia National Forest. Fishers are a mammalian species that have been classified as a "sensitive species."

SF Keeper maintains, *inter alia*, that the Forest Service has failed to adequately analyze the impacts of the planned logging practices on the Fisher.  SF Keeper argues that Defendants'

Supplemental Information Report ("SIR") dated April 12, 2017 is insufficient and that at a minimum, Defendants should have prepared a rigorous supplement to the 2013 Environmental Assessment[1] or prepared an Environmental Impact Statement ("EIS") due to "significant changes" since 2013. Defendants maintain, *inter alia*, that the SIR is sufficient and that the Frog Project would have only minimal, short-term effects on individual Fishers, if any, and will ensure that habitat in the area can better withstand drought, fires, and insects in the future. This in turn would benefit the Fishers in the long term by protecting their habitat from potentially extreme destruction on a vast scale. Defendants, SF Products and SF Keeper have filed cross motions for summary judgment. For the reasons that follow, Defendants' and SF Products' motions for summary judgment will be granted.

## I.      CROSS-MOTIONS FOR SUMMARY JUDGMENT

## PROCEDURAL BACKGROUND

The complaint commencing this action was filed on June 1, 2016, and sought a declaration that Defendants had violated NEPA with respect to both the Frog and Rancheria Projects, that the Forest Service be required to "supplement their NEPA analyses and submit Environmental Impact Statements for both Projects and that the Forest Service be enjoined from further activity until the EIS's are complete. Doc. No. 1. On July 7, 2016, SF Keeper filed a motion for preliminary injunction, permanent injunction and summary judgment. Doc. No. 8. On July 31, 2016, SF Keeper filed a notice of withdrawal of its motion for preliminary injunction in light of the Forest Service's decision to halt the Projects. Doc. No. 17. The motions for permanent injunction and partial summary judgment remained. On September 22, 2016, this Court denied SF Keeper's motion for partial summary judgment and injunctive relief without prejudice. Doc. No. 24. On January 5, 2017, this Court granted SF Products' motion to intervene.

On April 20, 2017, Defendants filed a notice of determination to prepare a supplemental environmental analysis of the Rancheria Forest Restoration Project. Doc. No. 42. Thereafter, on

---

[1] An "Environment Assessment" is also sometimes referred to as an "EA."

May 9, 2017, SF Keeper filed a First Amended Complaint dropping the Rancheria Project and focusing only on the Frog Project. Doc. No. 46. SF Keeper seeks a declaration that Defendants have violated NEPA and the NFMA, and an order that Defendants must supplement the Frog NEPA analysis in a supplemental Environmental Assessment or an EIS before they can authorize any further implementation of the Frog Project. Id. The parties then filed cross-motions for summary judgment, which are now before this Court.

## **FACTUAL BACKGROUND**[2]

### *1. The Fisher and its Habitat*

The Fisher is a forest-dwelling mammal in a family that includes weasels, mink, martens, and otters. They are about the size of a large house-cat and are light brown to dark blackish-brown. 74 Fed. Reg. 22710, 22714 (April 18, 2016). PSMFO 1.[3] Fisher occurrence is consistently associated with low- to mid-elevation coniferous and mixed conifer and hardwood forests with characteristics of late-successional forests (large-diameter trees, coarse downed wood, and singular features of large snags, tree cavities, or deformed trees). Id. PSMFO 2.[4] Fishers are associated with moderate to dense forest canopy. The most consistent predictor of Fisher occurrence at large spatial scales was moderate to high amounts of contiguous canopy cover rather than specific habitat type. Research has suggested that inadequate canopy cover limits Fisher distribution across forest types and ecoregions. F00282. PSUMF 3. The greatest risk to Fisher

---

[2] (1) "PSUMF" refers to Plaintiff's Statement of Undisputed Material Facts that Defendants agree is undisputed. "PSMFO" refers to Plaintiff's Statement of Undisputed Material Facts that Defendants object to.
(2) "DSUMF" refers to Defendants' Statement of Undisputed Material Facts that Plaintiff agrees is undisputed. "DSMFO" refers to Defendants' Statement of Undisputed Material Facts that Plaintiff objects to.
(3) "DISUMF" refers to Defendant Intervenor's Statement of Undisputed Material Facts that Plaintiff agrees is undisputed. "DISMFO" refers to Defendant Intervenor's Statement of Undisputed Material Facts that Plaintiff objects to.

[3] Defendants object that the citation for this proffered fact is ambiguous and uncertain, and there is no evidentiary support for this proffered fact located at page 22714 of volume 74 of the Federal Register.

[4] Defendants object that the citation for this proffered fact is ambiguous and uncertain, and there is no evidentiary support for this proffered fact located at page 22714 of volume 74 of the Federal Register.

habitat loss comes from uncharacteristically [severe] wildfires. SF_16; F_227. DSUMF 169.[5]

## 2. *Fisher Population Numbers and Sensitive Species Designation*

The Southern Sierra Nevada native population of Fishers is small and is geographically separated from the remainder of the Fishers in the west coast States. 74 Fed. Reg. at 22716. PSMFO 4.[6] Estimates for the Southern Sierra Nevada population range from a low of 100 to a high of 500 individuals, with a recent 2016 estimate of 256 female Fishers based on available habitat, and other estimates from 2011 of 125-250 adult Fishers to fewer than 300 adult Fishers and 276-359 Fishers, including juveniles and adults. Id. PSMFO 5.[7] Fishers have been listed by the Forest Service as a sensitive species since 1984. F00270. PSUMF 8.

The Forest Service defines "sensitive species" as those plant and animal species identified by a Regional Forester for which population viability is a concern as evidenced by significant current or predicted downward trend in numbers or density. SF1508 (Forest Service Manual 2670.5) PSUMF 9. In 2004, the U.S. Fish and Wildlife Service ("US Fish and Wildlife Service" or "USFWS") determined that Fishers warranted federal protection under the Endangered Species Act ("ESA"). 69 Fed. Reg. 18,770 (Apr. 3, 2004), and ten years later proposed a rule to list Fishers as "threatened" under the ESA. 79 Fed. Reg. 60,419 (Oct. 7, 2014). PSUMF 10. Recently, US Fish and Wildlife Service withdrew its listing proposal. 81 Fed. Reg. 22,710 (Apr. 18, 2016). PSUMF 11.

## 3. *Timber Project Geographic Locations*

The Frog and Rancheria Project areas are located in Tulare and Kern Counties in the Greenhorn Mountains of the Sequoia National Forest, just north and south of the community of Alta Sierra, California. F00033; SF0047 (showing the projects in relationship to other Forest Service projects in the Greenhorn Mountains). PSUMF 6. The "Core 2" area for Fisher

---

[5] Plaintiff: Undisputed that the Silvicultural Review and the 2012 Environmental Assessment makes these assertion [sic].

[6] Defendants object that the citation for this proffered fact is ambiguous and uncertain, and there is no evidentiary support for this proffered fact located at page 22716 of volume 74 of the Federal Register.

[7] Defendants object that the citation for this proffered fact is ambiguous and uncertain, and there is no evidentiary support for this proffered fact located at page 22716 of volume 74 of the Federal Register.

conservation, which includes the Greenhorn Mountains, has the highest recorded Fisher occupancy rates, highest predicted average habitat quality, and highest genetic diversity of Fishers in the Southern Sierra Nevada Assessment Area.  SF0158.  PSUMF 7.

### 4. *Proposed Benefits of the Frog Project*

When trees grow closely together, they compete for limited water, sunlight, and nutrients, which causes reduced growth and canopy development. F_40, 75, 155.  DSUMF 61.  As initially proposed, Frog would thin trees on 1,620 acres of the Sequoia National Forest in an area 25 miles southeast of Porterville, California, and far outside of the Giant Sequoia National Monument. F_9. DSMFO 62.[8]  The Frog project area contains dense, overcrowded trees characterized by stagnant growth, low diversity, high potential mortality from insects and drought, and high fire risk. F_34. DSMFO 63.[9]  The Forest Service has determined that current fuel loads in the project area pose a high risk of catastrophic loss of property, natural resources, and possibly even life. SF_21. DSUMF 167.[10]  By implementing Frog, surface fuels would decrease 40 to 80 percent, thereby limiting the size and severity of wildfires in the project area. SF_21. DSUMF 168.[11]  By thinning stands in the Frog project area, the Forest Service seeks to promote the growth of healthy, diverse trees and complex forest structures that would benefit wildlife and withstand insects, drought, and fires. The Forest Service also seeks to remove hazard trees that pose a risk to public safety along roads, trails, and other improvements in the area. F_39–40.  DSUMF 64.

[8] It is undisputed that the original acreage was 1,620 acres and the rough location of the Frog Project is 25 miles southeast of Porterville, California.  However, Plaintiff objects that the remaining statement misstates evidence and asserts that the Frog project is not "far outside the Giant Sequoia National Monument." Instead, "[t]he Frog Project Area is directly east of, and adjacent to, the designated boundary of the Monument (See Appendix A, Map 1)." F_35; see also F_248 (map).

[9] Plaintiff: Objection. Misstates evidence. There are no statements of "stagnant growth" or "low diversity" at the cited page. Instead, "Forest Service professionals, familiar with the area, observed declining forest stand health and expressed concern about high forest stand densities, low stand growth, continued large tree mortality due to insect attack and periodic drought, and the high risk of wildfire." F0034.

[10] Plaintiff: Undisputed that the Revised Fisher BE makes that assertion.

[11] Plaintiff: Undisputed that the Revised Fisher BE makes that assertion.

### 5.  *Initial Approval of the Frog Project by the Forest Service*

Pursuant to NEPA, 42 U.S.C. § 4332, the Forest Service analyzed Frog in an Environmental Assessment, responded to public comments, and approved the project in 2001 with a Finding of No Significant Impact ("FONSI"). F_9, 45.  DSUMF 65.  The Forest Service issued its original decision to proceed with the Frog Project on February 5, 2001, supported by the 2000 Frog Environmental Assessment.  F02402. PSUMF 13. The McNally Fire burned across 150,000 acres, including portions of the project area. Frog was thus modified to include salvage harvest on 190 acres of fire-damaged trees. In addition, because the McNally Fire changed the distribution of spotted owl, 180 acres of Frog were set aside as a spotted owl Protected Activity Center. F_9–10, F_35–36.  DSUMF 66.  Salvage harvest operations on Frog were completed in 2003. F_10. DSUMF 67.

### 6.  *Overview of Sierra Forest Products' Logging Work on the Frog Project*

[Intervenor-Defendant] SF Products holds the Frog Thinning Timber Sale contract, which was originally executed in 2001. First Decl. of Larry Duysen ¶ 19 (Dkt. 12. First Duysen Decl.). SF Products was awarded the Frog Thinning contract in October 2001, shortly after initial project development. First Duysen Decl. ¶ 23.  DISUMF 1. SF Products began implementing the contract, harvesting on 190 acres by 2003. First Duysen Decl. ¶ 19.

One hundred ninety acres were logged after a fire, which left 1,260 acres available in timber sale units (F00079), including 855 acres of Fisher habitat. F00315. The Frog Timber Sale contract, held by [SF Products], includes 780 acres, some of which have already been logged. SF1549; see also SF1553 (map, showing and listing 603 cut and 177 un-cut acres, including 66 acres of uncut Fisher habitat). Much of the Frog Project has not been cut, advertised, or sold. Id. (see units labeled as "Frog II"). PSUMF 18.  The Revisions 1.

Work stopped in October 2006 due to an injunction. Id.  DISUMF 2.  SF Products resumed operations in 2015. Second Duysen Decl. ¶ 4. As of the end of the 2015 operating season, SF Products had completed over 83% of the harvest and only 157 acres remain to be harvested. Id.

DISUMF 3.[12] SF Products intends to resume the Frog Thinning work [in late September 2017][13], when restrictions relating to Fisher are lifted. Second Duysen Decl. ¶ 4. SF Products plans to employ about eight loggers to conduct the harvest, along with three to four truck drivers, and will use the material to keep its 120 mill workers on the job. Id. ¶ 7. DISMFO 5.[14] In addition to the Frog Thinning contract, another contract, "Frog II," will be sold to implement the Frog Project. Second Duysen Decl. ¶ 8. SF Products expects to bid on Frog II and is the likely purchaser of the second sale on the project. Id. ¶¶ 8, 23. DISMFO 6.[15] SF Products's wood supply is highly tenuous. Second Duysen Decl. ¶ 10. A halt to the project that could result from vacatur threatens the ability of the mill to keep operating at current levels and could result in layoffs or payroll reductions. Id. The mill is important to the economy of Tulare County. First Duysen Decl. ¶ 7. DISMFO 7.[16]

### 7. *Litigation Regarding the Fisher*

On January 27, 2005, a group of Plaintiffs, including SF Keeper, filed suit against various projects that eventually included the Frog Project. See Sierra Club v. Bosworth, 465 F. Supp. 2d 931, 935 (Aug. 25, 2006). PSUMF 14. In 2006, the U.S. District Court for the Northern District of California enjoined further activity on the Frog project. Of particular concern was a finding by the Fish and Wildlife Service that the Fisher may meet the criteria for listing under the Endangered Species Act. F_10; Sierra Club v. Bosworth, N.D. Cal. Case No. 05-397 CRB, ECF No. 210, at 13. DSUMF 68. Several conservation groups concerned with Fisher protection have filed suit to challenge the US Fish and Wildlife Service's decision not to list the Fisher as a threatened or

---

[12] Plaintiff: Undisputed, except that the Forest Service reports that "177 acres of treatment remain" in the existing sale. SF0063.

[13] SF Products initially intended to resume work in August 2017.

[14] Plaintiff has no way to dispute or object to what SF Products plans to do in the future or how it intends to implement its contract or otherwise conduct the activities at its mill.

[15] Plaintiff: Undisputed that the Forest Service is likely to sell another contract to implement the Frog Project in the future. Otherwise, Plaintiff has no way to dispute or object to what SF Products plans to do in the future or whether it will be the likely purchaser of the Frog II contract, which is speculative.

[16] Plaintiff has no way to dispute or object to the status of SF Product's wood supply, potential operational or employment issues, or the mill's importance to the economy (which is vague and speculative), and submits that these statements constitute extra-record evidence not included in the Administrative Record.

1  endangered species. That decision has been challenged in Federal court. <u>See</u> <u>Center for Biological</u>
2  <u>Diversity v. U.S. Fish and Wildlife Service</u>, No. 3:16-cv-06040 (N.D. Cal., Oct. 19, 2016)
3  (Complaint). PSUMF 12.

4      On August 25, 2006, Judge Breyer of United States District Court for the Northern District
5  of California issued an order that permanently enjoined the several timber sale projects in that
6  case, which included the Frog Project, the adjacent Ice Tractor, Ice Helicopter, Saddle, and White
7  River projects, "until a satisfactory supplemental NEPA review has been conducted concerning
8  the recent and significant new information on the Pacific Fisher." <u>Sierra Club</u>, 465 F. Supp. 2d at
9  942.  PSUMF 15.

10  **8. *2012 Biological Evaluation***

11      The Forest Service convened an interdisciplinary team to complete an extensive review of
12  scientific studies and literature and assess potential effects of Frog on the Fisher, culminating in a
13  2012 Biological Evaluation that spanned 100 pages. F_254–58.  DSMFO 69.[17]  The analysis in
14  Frog's 2012 Fisher Biological Evaluation was incorporated into a revised Environmental
15  Assessment and several project design features to minimize impacts on Fisher. SF_17; F_219,
16  262, 274, 295–96, 304, 309, 336, 623.  DSUMF 70.  According to Frog's 2012 Biological
17  Evaluation for the Fisher, the baseline vegetation for areas outside of the Frog project units—
18  including most areas in the seventh order watersheds overlapping the Frog project—used an
19  Existing Vegetation (or "EVEG") layer from 2001 to 2003. F_269, 297, 330; Cordes ¶ 24 & n.5.[18]
20  DSMFO 128.[19]

21      The Forest Service issued a Finding of No Significant Impact in 2013 after finding that

---

[17] Plaintiff objects that the phrase "extensive review" is vague and ambiguous.

[18] To the extent that any facts solely rely on the Cordes declaration, the Court will ignore such facts since as stated below, Defendants' motion in the alternative to admit the Cordes declaration is denied as moot.

[19] Plaintiff: Objection. Misstates evidence. There is no mention of EVEG in the original Frog Project documents, likely because EVEG did not exist in 2001 to 2003. "Brief History of the Existing Vegetation Technical Guide," provided on the Forest Service's website at the bottom of the page at https://www.fs.fed.us/emc/rig/protocols/vegclassmapinv.shtml (last visited June 5, 2017) (indicating that the original EVEG guide, vers. 1.0 was published in 2005). Instead, the Frog Project documents refer to CWHR and CWHR 2.1 habitat information. See F_269, 297, 330. This proffered fact relies on the Cordes Declaration, which makes the same incorrect assertions, but the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record. See <u>Citizens to Preserve Overton Park</u>, 401 U.S. at 419.

Frog would not result in a loss of viability or contribute to factors that lead to federal protection of the Fisher under the Endangered Species Act ("ESA") and involved only a light to moderate change in Fisher habitat on a small proportion of available habitat. F_5, 45. DSUMF 76.[20] The Forest Service also found that Frog provided long-term benefits to the Fisher by reducing the risk of severe wildfires, which could permanently destroy Fisher habitat, and by promoting the growth and re-growth of understory vegetation and increasing available rest sites, tree size, and layered groups of trees. F_5–6, 337. DSUMF 77.[21]

### 9. 2013 Lift of the Injunction on the Frog Project

In response to the court's order, on May 14, 2013, the Forest Service issued a letter and four documents, which are relevant to the issues in this case: (1) A letter affirming the February 5, 2001, Decision Notice for the Frog Project Area Analysis Environmental Assessment (F00001); (2) An updated Finding of No Significant Impact for Revision 1 (SF00009); (3) Revision 1 to the Environmental Assessment for the 2000 Frog Project Area Analysis (F00024); and (4) A Supplemental Biological Evaluation (BE) for Fisher & Maps – Appendix A to Rev. 1 of the Environmental Assessment (F00251). PSUMF 16.

Shortly thereafter, on May 17, 2013, the Forest Service asked Judge Breyer to lift the injunction; and in response, on May 31, 2013, the plaintiffs filed a "Statement of Non-Opposition to Defendants' Motion for Relief from Judgment," in which they included the following statement:

> While this may respond to the narrow scope of Plaintiffs' procedural claim regarding significant new information, concerns remain about the substantive impacts of the Frog Project to Pacific Fishers, and the ongoing threats to the population viability of this rare species as a result of U.S. Forest Service commercial logging projects that unnecessarily remove mature trees and substantially reduce forest canopy cover in occupied Pacific Fisher areas. Plaintiffs are also concerned about apparent inaccuracies in the fire effects analysis in the revised Frog Project [Environmental Assessment], specifically,

---

[20] Plaintiff: Undisputed that the FONSI included this finding, although the issues of Fisher viability and the need for ESA protection remain highly controversial among scientists. 81 Fed. Reg. 22710, 22734 & 22739 (April 18, 2016) (considering climate change and the Fisher's small population size).

[21] Plaintiff: Undisputed that the FONSI included this finding, although as Plaintiffs expressed in their statement in response to Defendant's motion to lift the injunction against the Frog Project, "Plaintiffs are also concerned about apparent inaccuracies in the fire effects analysis in the revised Frog Project EA, specifically, the EA's substantial overstatement of expected tree mortality in a wildland fire under current stand conditions." SF1545.

the [Environmental Assessment's] substantial overstatement of expected tree mortality in a wildland fire under current stand conditions. Plaintiffs will continue to review the record and other supporting documentation for the Frog Project, and any other future projects, and hereby reserve the right to file an amended complaint challenging Defendants' decision to affirm the 2001 Frog Project Decision Notice and Finding of No Significant Impact.

SF1545. PSUMF 17. The 2006 injunction on Frog was lifted on July 13, 2013. <u>Sierra Club v. Bosworth</u>, N.D. Cal. Case No. 05-397 CRB, ECF Nos. 251, 253. DSUMF 78.

### 10. SF Keeper's 2014-2016 Correspondence with the Forest Supervisor

On March 27, 2014, SF Keeper and others sent a letter to Sequoia National Forest Supervisor Kevin Elliott asking the Forest Service to re-analyze the Frog, Rancheria, and other projects based on three new studies not cited in each projects' respective NEPA analyses. SF1371. PSUMF 45. In a letter dated May 14, 2014, Forest Supervisor Kevin Elliott responded, and stated that "I conclude that a revision to our environmental documents for the current and past projects listed in your letter is not necessary." SF1360. PSUMF 46. On January 11, 2016, SF Keeper and others sent a second letter to Forest Supervisor Kevin Elliott, requesting that the Forest Service re-analyze the Frog and Rancheria Projects and supplement their NEPA analyses based on new scientific information not cited in the projects' respective NEPA analyses. SF1341. PSMFO 47.[22] In a letter, dated January 22, 2016, Forest Supervisor Kevin Elliott acknowledges receipt of the January 11, 2016 letter, stating that "I may not get a response to you by the end of February, but I will get a response to you." SF1359. PSUMF 48.

### 11. The Fish and Wildlife Service Withdrew Its Request to List Fishers as a Threatened Species in April 2016

The Fish and Wildlife Service withdrew its proposal to list the Fisher as a threatened species after receiving further data from peer reviewers and the public and completing further analysis. 81 Fed. Reg. 22,710, 22,721 (Apr. 18, 2016). DSUMF 80.[23] The Fish and Wildlife

---

[22] Defendants concede it is undisputed that SF Keeper sent a letter to Forest Supervisor Kevin Elliott on January 11, 2016, containing the foregoing claims and contentions.

[23] Plaintiff: Undisputed, that the USFWS withdrew its proposal to list the Fisher; however, the need for ESA protection remains highly controversial among scientists. 81 Fed. Reg. 22710, 22734 & 22739 (April 18, 2016) (considering climate change and the Fisher's small population size). Moreover, the USFWS' decision not to list the Fisher has been challenged in Center for Biological Diversity v. USFWS, No. 3:16-cv-06040 (N.D. Cal., Oct. 19, 2016) (Complaint).

Service found no "indication that Fishers or their habitat in the west coast States are responding negatively to the stressors to which they are exposed to a significant degree at either the population or rangewide scales, nor are they likely to do so in the foreseeable future." 81 Fed. Reg. 22,710, 22,710 (Apr. 18, 2016). DSUMF 81.[24] The Fish and Wildlife Service found that, while individual Fishers might possibly be affected to some degree by thinning and other forest-management efforts, there is no evidence such activities "are causing Fisher to decline across its range currently, or that suggests an expected decline across its range in the future." 81 Fed. Reg. 22,710, 22,721 (Apr. 18, 2016). DSUMF 82.[25]

### 12. SF Keeper's Suit to Compel Supplemental NEPA Review of the Frog Project and Suspension of Frog by the Forest Service

On June 1, 2016, SF Keeper sued the Forest Service to compel supplemental NEPA review of the Frog project based on two Fisher studies and recent tree mortality. One month later, SF Keeper moved for partial summary judgment and a permanent injunction. Dkt. # 8.[26] PSUMF 20. Shortly thereafter, the Forest Service elected to suspend Frog to collect and analyze updated tree-mortality information. ECF Nos. 1, 8, 17 & 18 at 6–7. DSUMF 83.

### 13. Tree Mortality

In July of 2016, the Forest Service acknowledged the massive die-off of trees resulting from the drought in the Southern Sierras, reporting that 66 million trees had succumbed as a result. SF0093. PSUMF 31. "On the Sequoia National Forest, an estimated 7.2 million conifer trees died over an area of 224,000 acres in the period between October 2015 and May 2016 alone." SF0063.

---

[24] Plaintiff: Undisputed that the USFWS issued this finding; however, this issue is in dispute because it contradicts the USFWS's earlier finding "that the main threats to the West Coast DPS of Fisher are habitat loss from wildfire and vegetation management; toxicants (including anticoagulant rodenticides); and the cumulative and synergistic effects of these and other stressors acting on small populations" and "that several combinations of cumulative and synergistic stressors rose to the level of a threat in most Fisher populations …" 79 Fed. Reg. 60,419, 60,420 & 60,434 (Oct. 7, 2014).

[25] Plaintiff: Undisputed that the USFWS issued this finding; however, it also "found that vegetation management is a threat because that activities that remove or substantially degrade Fisher habitat through the removal of large structures and overstory canopy are projected to take place within the analysis area over the next 40 years." 79 Fed. Reg. at 60,430.

[26] Plaintiff maintains that it filed for a preliminary injunction to "avert imminent harm from logging, which was scheduled to restart on August 1, 2016." PSUMF 20.

PSUMF 32. "This historic tree mortality is creating rapidly changing landscape conditions on the Sequoia National Forest, and updated data on existing vegetation in the area is needed to fully understand the impacts the die-off is having on Fisher habitat." SF0063. PSUMF 33.[27] In August of 2016, the human-caused Cedar Fire began and eventually burned across more than 29,000 acres of the Greenhorn Mountains just south of the Frog Project. See SF0010, SF0047 (map). PSUMF 34. The Cedar Fire burned to the south of the seventh order watersheds overlapping the Frog project. SF_43, 47. DSUMF 127. In November of 2016, the Forest Service reported that an additional 36 million trees had died since May of 2016, for a total of over 102 million, with most located the southern and central Sierra Nevada region. SF1287. PSMFO 35.[28]

"Trees will continue to die throughout California despite the winter 2016/2017 precipitation. Typically, it takes one to three years after an above-normal precipitation year before trees regain their natural defenses against bark beetles." SF0048. PSUMF 36.[29] Forest Service "scientists expect to see continued elevated levels of tree mortality during 2017 in dense forest stands, stands impacted by root diseases or other stress agents and in areas with higher levels of bark beetle activity." SF1287. PSUMF 37.[30] Further, a NASA study found that "Tree mortality was higher than expected for large diameter trees, suggesting an acceleration of old-tree mortality..." SF1576. PSMFO 38.[31] A recent Forest Service map provides a dramatic illustration of the progression of tree mortality in the Southern Sierra Nevada from 2014 to 2016. SF1580. PSUMF 39. Frog's Environmental Assessment states that the latest forest stand data for the Frog Project area was collected in 2010. F00062. PSUMF 19.

---

[27] Defendants: Undisputed that the cited document contains this statement.

[28] Defendants object that this misstates evidence and claim that this cited press release states that the Forest Service identified an additional 36 million dead trees across California since its last aerial survey in May 2016, for a total of 102 million dead trees identified since 2010.

[29] Defendants: Undisputed that the cited document contains this statement.

[30] Defendants: Undisputed that the cited document contains this statement.

[31] Defendants object that this misstates evidence and claim that "Tree mortality was higher than expected for large diameter trees, suggesting an acceleration of old-tree mortality" was not a finding of the NASA study concerning the current wave of tree mortality; it was an observation from a study published over a decade ago in Smith TF, Rizzo DM, North M (2005) Patterns of mortality in an old-growth mixed- conifer forest of the southern Sierra Nevada, California. FOREST SCIENCE 51: 266-275. (SF1576, SF1577.)

"[T]ree mortality has not been uniform across the Sierra Nevada." SF_1328. DSMFO 85.[32] "A great deal of scientific literature and professional expertise indicates that active forest management . . . is necessary to minimize the extent of drought- and beetle-induced tree mortality and also to mitigate the adverse impacts from mortality that [have] already occurred." SF_1329. DSMFO 86.[33] "Given the serious risks associated with inaction and lack of forest management, [the Forest Service] must simultaneously study and manage the land. SF_1329. DSMFO 87.[34]

In August 2016, SF Keeper sent letters to Forest Supervisors in the Sierra Nevada asserting that recent tree mortality required halting numerous forest-management projects and withdrawing their supporting NEPA documents. The Regional Forester for the Pacific Southwest Region responded on August 30, 2016, stating that SF Keeper's "sweeping and drastic" request was not appropriate as a matter of law or policy. SF_1331, 1329. DSUMF 84.

***14. Forest Service Collected Images in Mid-2016 Which Show Habitat Relevant to Fishers***

To assess Frog in light of recent tree mortality, the Forest Service collected high resolution aerial images of the Sequoia National Forest in mid-July 2016. Using this data, the Forest Service updated the agency's geographic-information-system map of vegetation (termed "Existing Vegetation", or "EVEG"), which, among other things, shows California Wildlife Habitat Relationship Program ("CWHR") habitat. SF_11, 19, 47a (ECF No. 41-4); Cordes Decl. ¶¶ 8–9. DSMFO 90.[35] CWHR includes detailed information about habitat components important to Fisher, such as tree species, size, and canopy density. SF_47a (ECF No. 41-4), F_274; Cordes Decl. ¶ 9. DSMFO 91.[36] The complex and labor-intensive process of converting the July 2016 images into

---

[32] Plaintiff: Undisputed that this is what the Regional Forester asserted in his letter to Plaintiff, although this statement is not supported by data and is more an opinion than a fact.

[33] Plaintiff: Undisputed that this is what the Regional Forester asserted in his letter to Plaintiff, although this statement is not supported by data and is more an opinion than a fact.

[34] Plaintiff: Undisputed that this is what the Regional Forester asserted in his letter to Plaintiff, although this statement is not supported by data and is more an opinion than a fact.

[35] Plaintiff: "Undisputed that these documents make these assertions, except that the Court may not rely on the *post hoc* declaration of Jeff Cordes, which is not in the record.

[36] Plaintiff: "Undisputed that these documents make these assertions, except that the Court may not rely on the *post hoc* declaration of Jeff Cordes, which is not in the record."

EVEG took several months. ECF No. 29, at 2; SF_1298; Cordes Decl. ¶¶ 8, 16 & n.4; U.S. Forest Serv., Existing Vegetation Classification, Mapping and Inventory Technical Guide Version 2.0, at 3-13 (June 2015) (detailing the EVEG creation process), available at https://www.fs.fed.us/emc/rig/documents/protocols/vegClassMapInv/EVTG_v2-0_June2015.pdf. (last visited May 26, 2017). DSMFO 92.[37]

Aerial Detection Surveys tally the number of dead trees observed during flights over millions of acres across the entire state of California. SF_1287; Cordes Decl. ¶¶ 16–17; U.S. Forest Serv., Aerial Detection Survey Methodology, https://www.fs.usda.gov/detail/r5/forest-grasslandhealth/?cid=stelprdb5429568 (last visited May 26, 2017). DSMFO 129.[38] Aerial Detection Surveys occurred in different regions across California from May to September 2016. Cordes Decl. ¶¶ 11–15 & Ex. 2–3; U.S. Forest Serv., Aerial Survey 2016, at 2, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd539536.pdf (last visited May 26, 2017). DSMFO 130.[39] The Forest Service used satellite imagery to confirm that any difference in vegetation in the project area between July and October 2016 was *de minimis*. SF_47a (ECF No. 41-4); Cordes Decl. ¶ 8. DSMFO 131.[40]

### 15. SF Keeper's Motions Denied in September 2016

This Court denied SF Keeper's motions for partial summary judgment and a permanent injunction without prejudice on September 21, 2016, finding that SF Keeper "ha[d] not demonstrated either success on the merits or a substantial likelihood of success on the merits under the facts of the case as they now stand." This Court also held that the Forest Service already gave adequate consideration to the study authored by James D. Garner, Selection of Distributed Habitat

---

[37] Plaintiff: "Undisputed that these documents make these assertions, except that the Court may not rely on the *post hoc* declaration of Jeff Cordes, which is not in the record."

[38] Plaintiff: Undisputed, except that the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record."

[39] Plaintiff: Objection, the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

[40] Plaintiff: Objection. Misstates evidence. The cited reference never states that the difference between July and October 2016 was "de minimis." Instead, the assertion is that the "change of less than 1 percent due to mortality," which Plaintiff disputes. Moreover, the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

by Fishers (Martes Pennanti) in the Sierra National Forest (master's thesis, May 2013). ECF No. 24, at 14–16. DSUMF 88. In denying SF Keeper's motions, this Court further noted that "the sort of controversy that appears to underlie this action—a controversy typified by differences in opinion on the values of mutually recognized long and short term goals and risks—is not proper subject matter for determination by a district court in an action under NEPA." ECF No. 24, at 16. DSUMF 89.[41]

### 16. Conservation Biology Institute Analysis in Late 2016-Early 2017

In December of 2016, the Forest Service told the parties and this Court that it had completed its collection and processing of tree-mortality data and transmitted the data to its contractor for analysis. Suppl. JSR at 4 (Dkt # 29). PSUMF 40. The Forest Service contracted with its Fisher experts, the Conservation Biology Institute ("CBI"), to further analyze and process the data to determine current Fisher habitat suitability levels and distribution in the Sequoia National Forest, with an anticipated completion date of January 31, 2017. Id. PSUMF 41. In December 2016, the Forest Service provided the new EVEG layer to CBI to update a separate map of the southern Sierra Nevada (termed a "management grid") published in the 2016 Fisher Strategy. SF_1298. DSUMF 93. The Fisher Strategy's management grid system divides the landscape into a grid of hexagons, each of which covers 2,560 acres and is classified as suitable (green), potentially suitable (yellow), or unsuitable (red). SF_171, 176. DSUMF 94. In the Fisher Strategy's management grid system, describing a hexagon as "suitable" merely reflects a "statistical characterization" as to whether the area within the hexagon is "representative of areas used . . . by breeding females." It is a "proxy . . . at coarse, landscape scales" and "is not accurate at fine scales." SF_7, 174 n.12. DSUMF 95.

On February 27, 2017, and in a subsequent March 1, 2017, addendum, SF Keeper submitted an additional letter to the Forest Service, which requested a response to additional new circumstances and information. SF1278 & SF1265. PSUMF 49.

After CBI ran the Forest Service's updated EVEG information through its model for the

---

[41] Plaintiff: Undisputed that the Court made this statement, except that it also stated that "the court cannot be certain that Forest Service's promised consideration of the significance of new information on current plans for the Frog and Rancheria projects will not give rise to a meritorious claim for injunctive relief." Id.

management grid system, draft results showed many green hexagons were now yellow. SF_1294–95. DSUMF 96. After CBI ran the Forest Service's updated EVEG information through its model for the management grid system, CBI suggested that the model's definition of "suitability" may be too narrow, and further concluded that its method for classifying hexagons needed further refinement to account for data from different time periods. CBI thus advised against using hexagon-suitability classes or numerical targets for green hexagons in the analysis of forest-management projects. SF_1288, 1298, 55. DSMFO 97.[42]

In March 2017, CBI issued interim guidance for applying the Fisher Strategy's principles, goals, and objectives to forest-management projects. SF_54. DSUMF 98. CBI completed its analysis and determined that 92.5% (49/53) of suitable hexagons, each representing the size of an average female Fisher territory, had become unsuitable as Fisher habitat. SF1292. PSMFO 42.[43] But CBI also found significant problems with the datasets it used for its Fisher habitat suitability model, and cautioned that the results should not be applied until vegetation data could be updated. SF1298. PSUMF 43.[44] CBI also cautioned: "how Fishers are actually responding to these recent changes in forest structure is currently unknown, as field data from Fishers using such a post-mortality landscape are as of yet unavailable." Id. PSUMF 44.

In CBI's March 2017 guidance, CBI advised that, notwithstanding ongoing research and the reality that updated vegetation data inevitably lags project analysis, "increasing the resilience of the remaining patches of large living conifers will be important for the long-term persistence of

---

[42] Plaintiff: Objection. Misstates evidence. CBI does not suggest that the model's definition of suitability "may be too narrow" and does not advise against using the model only for "green hexagons." Instead, CBI stated that "data limitations make the **draft results highly uncertain; and we do not advise applying them** until vegetation layers are more comprehensively updated, and a more refined and justified analysis can be performed." SF1298 (bold in original). Moreover, "[r]esults suggest that tree mortality has greatly reduced the amount of suitable habitat on Sequoia NF, but **this result should be interpreted with great caution**." Id. "**Until these issues are rectified, we do not recommend applying the original management grid system to evaluate the changes to unsuitable, potentially suitable, and suitable cells at this time. We also do not recommend applying the conservation targets, nor the Strategy description of target cells, at this time.**" SF0055 (bold in original).

[43] Defendants object that this misstates evidence and claim that the draft results using CBI's model indicated that 92.5 percent (49 of 53) of green (suitable) hexagons were now yellow (potentially suitable). See SF0176, SF1295, SF1292.

[44] Defendants concede it is undisputed that CBI advised against using its draft update of the suitability grid. Defendants object that this misstates evidence and claim that CBI did not find problems in the datasets. Rather, CBI questioned whether its modeling algorithm could properly interpolate datasets from different time periods.

the Fisher population." SF_54, 56. DSMFO 99.[45] CBI's March 2017 guidance outlined an

approach for evaluating whether projects are likely to enhance forest health while avoiding

adverse impacts to Fishers. SF_57. DSMFO 100.[46] CBI's March 2017 guidance also outlined an

approach for evaluating projects on three spatial scales—the project (stand) scale, the Fisher home

range (hexagon) scale, and the Fisher population (Core) scale. SF_57–59. DSUMF 101. In

CBI's parlance, a "hexagon" or "cell" or "home range" is the approximate size of a female Fisher

breeding territory, which is about 4 square miles or 2,560 acres. SF_171. DSUMF 102. The

"seventh order watershed" scale is roughly equivalent to the size of a Fisher home range or

hexagon. SF_9, 27. DSMFO 103.[47]

In CBI's parlance, a "Core" is a contiguous area of Fisher habitat in which Fishers can

establish home ranges and comingle as a population. SF_144. DSUMF 104. Frog is located in

"Core Area 2," which covers 213,321 acres. SF_31. DSMFO 105.[48] CBI's March 2017 guidance

outlined an approach for evaluating projects that considered potential impacts to "moderate and

high-capability CWHR 2.1 habitat," as well as "high-value reproductive habitat." SF_57–59.

DSMFO 106.[49] High-value reproductive habitat (or "CBI habitat") is largely a subset of CWHR

2.1 related to areas used by breeding female Fishers. SF_56–57, 182, 193, 247, 47a (ECF No. 41-

[45] Plaintiff: Objection. Misstates evidence. CBI did not "advise" this, but instead stated that "it is probable that maintaining, and increasing the resilience of the remaining patches of large living conifers will be important to providing for the long-term persistence of the Fisher population." SF0054. Moreover, while "the authors recognize the need to improve the resiliency of stands impacted by tree mortality and to mitigate the hazards posed by dead trees," they cautioned that "it is likely that [Fishers] are experiencing elevated stress due to habitat change and may be less tolerant of disruption than previously documented." SF0056-57.

[46] Plaintiff: Objection. Misstates evidence. While the authors "describe an interim process for designing and evaluating vegetation management projects," they do not state that these designs or evaluations will result in "avoiding adverse impacts to Fishers." SF0057.

[47] Plaintiff: Objection. Misstates evidence. Those statements do not assert that a 7th order watershed is "roughly equivalent" in size to a Fisher home range. Instead, the Forest Service uses its 7th order watershed scheme as a substitute for a female home range area (SF0009 & 27), even though the average 7th order watershed area in the Frog Project area is "approximately 3,697 acres" or 44% larger than the CBI hexagon of 2,560 acres (3,697/2,560=1.44). Id.

[48] Plaintiff: Undisputed, except this is only the portion within the forest boundary and this includes only "109,919 acres of suitable CWHR 2.1 habitat and 71,662 acres of high value reproductive habitat as defined by CBI." Id.

[49] Plaintiff: Undisputed, except that the "approach" suggested evaluation of at least the following: canopy cover; large trees and snags; hardwood basal area and total basal area; remaining CWHR high reproductive value habitat pockets/refugia; connectivity between pockets of high value reproductive habitat, as indicated by presence of other moderate and high capability habitat as defined by CWHR 2.1 (SF0057-58)

4). DSUMF 107. CBI's March 2017 guidance outlined an approach for evaluating projects that considered ground disturbance in affected hexagons using recommended Fisher-tolerance thresholds adapted from William J. Zielinski et al., An assessment of Fisher (Pekania pennanti) tolerance to forest management intensity on the landscape, 310 FOREST ECOL. & MGMT 821 (Oct. 10, 2013). SF_59, 56. DSUMF 108.

**17. Forest Service's 2017 Announcement of Delaying the Forest Plan Revisions**

On March 20, 2017, the Forest Service announced that it would delay the schedule of Forest Plan Revisions for the Sequoia and Sierra National Forest to "consider changed vegetation conditions" related to the extraordinary die-off of trees in the Southern Sierras and issue a new supplemental Draft Environmental Impact Statement in early 2018. 2nd Voss Dec., Exhibit A. PSUMF 50.

**18. Southern Sierra Fisher Conservation Strategy's March 2017Amendment**

On or about March 28, 2017, the authors of the Southern Sierra Fisher Conservation Strategy (also known as the Fisher Technical Team) issued an interim amendment to the Fisher Conservation Strategy, titled Changed Circumstances and Implementation of the Southern Sierra Nevada Fisher Conservation Strategy Note from the Authors, March 2017. SF0054. PSMFO 51.[50] The amendment addresses application of the conservation strategy to project implementation, considering the substantial changes to structural components of Fisher habitat in light of the massive die-off of trees in the Southern Sierras. SF0054-59. PSMFO 52.[51]

The Fisher Technical Team acknowledged a number of concerns related to the recent changed circumstances related to the massive die-off of trees from the drought:

> The habitat analyses, models, and recommendations in the Strategy were based on vegetation conditions during its preparation, as reflected in datasets updated mostly as of 2012. However, since then, dramatic changes have occurred in Sierra Nevada

---

[50] Defendants concede it is undisputed that the authors of the Southern Sierra Fisher Conservation Strategy issued the document titled "Changed Circumstances and Implementation of the Southern Sierra Nevada Fisher Conservation Strategy Note from the Authors, March 2017."

[51] Defendants object that the document speaks for itself. Defendants object that this misstates evidence and claim that the cited document did not identify weaknesses in the datasets. Rather, the cited document observed that "[t]here is no vegetation mapping program today that is updated annually and systematically," nor is there "a standard means of translating between on-ground (plot based) measurements and . . . remotely sensed metrics," which "makes evaluating changes in Fisher habitat conditions following disturbances very difficult."

18

mixed conifer forests due to drought and extraordinary tree mortality. The Strategy could not have anticipated nor account for such changes. SF0054.

PSUMF 53.[52] The Fisher Technical Team also cautioned:

> There is no available research or direct observations concerning how massive changes in tree cover due to drought and insect mortality, including death in even the largest tree classes, may affect Fisher habitat use or population processes. There is also no direct evidence indicating how Fishers will respond to management actions being implemented by land managers in response to this mortality event. SF0054.

PSUMF 54.[53]

Citing fundamental weaknesses in the combination of datasets used to support the

hexagon management grid system used by the Forest Service to track Fisher habitat suitability at

the landscape level, the Fisher Technical Team stated that the landscape model was unreliable:

> Until these issues are rectified, we do not recommend applying the original management grid system to evaluate the changes to unsuitable, potentially suitable, and suitable cells at this time. We also do not recommend applying the conservation targets, nor the Strategy description of target cells, at this time. SF0055.

PSMFO 55.[54] According to the Fisher Conservation Strategy's altered specifications, project-level

analysis should now:

- Avoid treating two or more adjacent cells in a manner that reduces connectivity of remaining high reproductive habitat value (CWHR 4D, 5M, 5D, and 6) within and between cells.
- When treating cells within or adjacent to recently disturbed areas (e.g. severely burned or highly impacted by drought mortality), protect and promote connectivity within and between cells, and focus treatment on increasing resilience of remaining suitable habitat. SF0056.

PSMFO 56.[55] Moreover, according to the strategy's altered specifications, project-level analysis

---

[52] Defendants: Undisputed that the cited documents contains this statement.

[53] Defendants: Undisputed that the cited documents contains this statement.

[54] Defendants concede it is undisputed that the cited document advised against using hexagon-suitability classes or numerical targets for green hexagons in the analysis of forest-management projects. However, Defendants object as follows: Misstates evidence. The cited document did not identify weaknesses in the datasets. Rather, the cited document observed that "[t]here is no vegetation mapping program today that is updated annually and systematically," nor is there "a standard means of translating between on-ground (plot based) measurements and . . . remotely sensed metrics," which "makes evaluating changes in Fisher habitat conditions following disturbances very difficult."

[55] Defendants do not dispute that the cited document contains the excerpted language. However, Defendants object that this misstates evidence as the document describes these "bullets" as "suggested revisions" and does not assign them to a particular spatial scale for analysis.

should provide a more rigorous[56] analysis at the "Stand scale":

> Stand scale—this scale represents the availability of individual habitat features within the project area. Structural characteristics such as canopy cover or large tree availability should be evaluated for the proposed action and any alternatives, with availability of the structural characteristics projected into the future both with and without a simulated fire.
>
> Select habitat characteristics relevant to the project area based on available research and strategy recommendations. The importance of habitat elements such as canopy cover, large tree and snag availability, and hardwood basal area has been repeatedly supported. Other factors, such as the acreage of moderate and high capability habitat as defined by CWHR 2.1, and high value reproductive habitat (CWHR 4D, 5M, 5D, and 6) should also be included. We suggest evaluating at least the following:
>   o canopy cover
>   o large trees and snags
>   o hardwood basal area and total basal area
>   o remaining CWHR high reproductive value habitat pockets/refugia
>   o connectivity between pockets of high value reproductive habitat, as indicated by presence of other moderate and high capability habitat as defined by CWHR 2.1
>
> Compare the current and projected availability of these elements under the management alternatives, as well as with and without wildfire, using FVS software. Note that FVS projections for canopy cover in particular are unlikely to align with SSNFCS recommendations (which are based on remotely-sensed metrics). One approach to addressing this issue has the following four steps: 1) compare the current FVS modeled value to the current EVEG value; 2) project stand characteristics forward using FVS; 3) measure the change in FVS from current to projected; 4) add or subtract this change from the current EVEG value and use the resulting number as the likely future condition If possible, compare the trajectory of these habitat elements in the project area with the projected changes in fire characteristics such as flame length and torching index under the different alternatives.
>
> Consider the cost vs. benefit of management alternatives, and look for opportunities to modify prescriptions to minimize negative impacts, while recognizing that short-term risk may be necessary to meet longer term conservation and resiliency objectives. SF0057-58.

PSUMF 57.

### 19. The Forest Service's Supplemental Information Report of April 2017

On April 12, 2017, the Forest Service issued a SIR and supporting materials to document the agency's analysis of whether Frog will affect the environment in a significant manner or to a significant extent not already considered by the project's 2013 Environmental Assessment. SF_1–

---

[56] Defendants object that the phrase "more rigorous" is vague, ambiguous, and argumentative—not factual. Defendants do not dispute that the cited document otherwise contains the excerpted language.

1    47.  DSMFO 109.[57]  The SIR and its supporting materials predicted a slight drop (three percent) in

2    canopy compared to baseline conditions, which were updated to reflect tree mortality since the

3    2013 Environmental Assessment. SF_8– 9, 19–27; Cordes Decl. ¶¶ 7–8.  DSUMF 110.[58]

4         The SIR and its supporting materials predicted slight, short-term reductions in moderate

5    and high-capability CWHR2.1 habitat and high-value reproductive habitat. SF_9, 25–27.  DSUMF

6    111.  At the home-range scale, the SIR and its supporting materials calculated only minor shifts in

7    moderate and high-capability CWHR2.1 habitat and high-value reproductive habitat without any

8    significant barriers to Fisher movement. SF_9, 27–29.  DSUMF 112. At the Core scale, the SIR

9    and its supporting materials determined that Frog and other projects combined would affect only 4

10   percent of the 109,919 acres of moderate and high-capability Fisher habitat, and only 3 percent of

11   the 71,662 acres of high-value reproductive Fisher habitat, taking into account the 2016 Cedar

12   Fire. SF_10–12, 31, 36–37.  DSUMF 113.

13        The SIR and its supporting materials determined that ground disturbance from Frog and

14   other projects would not exceed recommended thresholds in affected hexagons. SF_35–36.

15   DSUMF 114.  In issuing the SIR, the Forest Service recognized that tree mortality may continue

16   for 1 to 3 years and was "likely to further lower habitat quality" generally. SF_9.  DSUMF 115.

17   In issuing the SIR, the Forest Service found "no indication that implementation of the Frog Project

18   would significantly impact or . . . contribute to a loss of viability of Fishers." SF_9–10.  DSUMF

19   116.  In issuing the SIR, the Forest Service found that the Frog project area contains only a tiny

20   percentage of habitat within the relevant Fisher Core, and the units are small and scattered

21   throughout a wide geographic expanse. SF_10.  DSMFO 117.[59]

22        In issuing the SIR, the Forest Service concluded that treatments would not render any unit

23

24   _____

25   [57] Plaintiff: Undisputed that the Forest Service issued the SIR that makes this assertion, but Plaintiff disputes that this
     analysis was sufficient to determine "whether Frog will affect the environment in a significant manner or to a
     significant extent not already considered by the project's 2013 EA."

26   [58] Plaintiff: Undisputed that the SIR makes this assertion. Plaintiff states this for DSUMFs 110-116.

27   [59] Plaintiff: Undisputed, that the SIR roughly makes this assertion, except that the SIR used the term "very small" and
28   not "tiny," and used the term "Project area" and not "wide geographic expanse." Id.

unsuitable for Fishers, as defined by the CWHR 2.1 habitat model. SF_10; F_274. DSUMF 118.[60]
In issuing the SIR, the Forest Service found that tree mortality is confined to lower elevations of
the project area and underscores the need to maintain and promote resilience among the remaining
living trees. SF_10, 14–15; Cordes Decl. ¶ 10 & Ex. 1. DSMFO 119.[61] The SIR considered field
reports on the project's silvicultural prescriptions and fuel treatments based on updated tree-
mortality information. SF_2, 14–18. DSMFO 120.[62]

According to the Revised Frog Project Fuels Review 2017, "If left untreated, surface fuel
accumulations will increase in existing and future areas of mortality . . . . This increase in fuel
loading will cause additional mortality in the event of an uncontrolled wildfire." SF_14. DSUMF
121.[63] According to the 2017 Frog Project Silvicultural Review, tree mortality "makes the need to
increase the resilience of the remaining stands of green trees urgent," and "the Frog project is
expected to result in a healthier, more resilient stand of trees." SF_16. DSUMF 122.[64]

Research indicates that "the risk of taking no action [is] a greater threat to Fisher and their
habitat than a series of modeled fuels reduction projects with activities similar to the Frog
Project." SF_21. DSUMF 123.[65] Frog's 2013 Environmental Assessment and 2017 SIR and their
supporting documents refer to "2010" as the existing condition or baseline. In other words, "2010"
does not literally refer to calendar year 2010—it is "Year 0" of project implementation. F_299,
304, 309; SF_20–21, 24–25, 28–29, 42, 44; Cordes Decl. ¶ 7 & n.2. DSUMF 124.

Because the SIR uses updated EVEG data that reflects recent mortality, canopy closure in

---

[60] Plaintiff: Undisputed that the SIR makes this assertion, but Plaintiff disputes this conclusion.

[61] Plaintiff: Objection. Misstates evidences. While the SIR makes the assertion that tree mortality is confined to lower
elevations, Plaintiff has provided evidence that mortality is also high in the higher elevation units of the project area.
See ECF # 47-5 (2nd Sheehey Decl. Ex. C). [NOTE: As stated below, the Court denied Plaintiff's request to admit the
second Sheehey declaration.] [. . .] Nevertheless, the Court may not rely on the post hoc declaration of Jeff Cordes,
which is not in the record.

[62] Plaintiff: Objection, misstates evidence. The SIR does not describe the cited reports as "field reports," and neither
the Frog Project Silvicultural Review nor the Revised Frog Project Fuels Review-2017 contain any "field"
information or other indications that Forest Service staff visited the field in support of their reviews. Id.

[63] Plaintiff: Undisputed that the review makes this assertion.

[64] Plaintiff: Undisputed that the review makes this assertion.

[65] Plaintiff: Undisputed that the Revised Fisher BE makes this assertion.

"2010" is reduced from levels previously analyzed, showing approximately 45 percent instead of 51 percent canopy closure in CWHR 2.1 habitat. F_192, 299; SF_1–3, 11, 19–20, 47a (ECF No. 41-4); Cordes Decl. ¶ 7 & n.2.  DSMFO 125.[66] The Forest Service projected updated, existing canopy closure into the future using different scenarios (implementation, no-action, wildfire) and spatial scales. See, e.g., SF_58–59, 20–21, 28–29, 42–45.  DSUMF 126.[67]  The SIR and its supporting materials show canopy changes across all project units and watersheds. SF_21, 29. DSMFO 159.[68]  The SIR and its supporting documents show that any reduction in canopy closure across Frog's units will be far less than 30 percent (in absolute terms) in high-reproductive Fisher habitat. SF_21, 47a (ECF No. 41-4), 57; see also Cordes Decl. ¶ 20 & Ex. 4 (showing changes in canopy closure in mature forest habitat on a unit-by-unit basis).  DSMFO 164.[69]

***20.  Forest Service's Decision in 2017 to Proceed with the Frog Project but Requiring Supplemental NEPA Analysis for the Rancheria Project***

On April 12, 2017, the Forest Service issued its determination not to supplement its NEPA analysis, and decided to proceed with the Frog Project. SF0001.  PSUMF 22. Logging in the Frog Project area may commence [in late September 2017][70] at the earliest. SF0064.[71] PSUMF 23.[72]

---

[66] Plaintiff: Objection. Misstates evidence. This is a post hoc rationalization by Defendant's counsel made in the brief, and there is no support anywhere in the SIR or Revised Fisher BE for this explanation. See Or. Natural Desert Ass'n v. Bureau of Land Management, 531 F.3d 1114, 1141 (9th Cir. 2008) (explaining that courts may not accept counsel's post hoc rationalizations for agency action, and an agency's action can only be upheld on the basis articulated by the agency itself) (citations omitted). For the same reason, the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

[67] Plaintiff: Undisputed that the Forest Service included these canopy cover forecasts.

[68] Plaintiff: Objection. Misstates evidence. The SIR at SF0021 shows only the average canopy cover changes into the future for CWHR 2.1 habitat in each unit and not all project units. SF0029 only shows the "Changes in percent of canopy closure density class categories in CBI high value reproductive habitat within the 7th Order Watersheds" and not all project areas. SF0028 only shows the "Changes in percent of canopy closure density class categories in moderate and high suitability Fisher habitat defined by CWHR 2.1 within the 7th Order Watersheds affected by the Frog Project area" and not canopy cover changes in all project areas.

[69] Plaintiff: Objection. Misstates evidence. The SIR and its supporting documents never show that the Frog Units meet the standard from the 2004 Sierra Nevada Forest Plan Amendment, which requires documentation of canopy cover reduction by treatment unit. Moreover, the average canopy cover changes shown in the SIR and its supporting documents describe only canopy cover reduction of CWHR 2.1 and CBI high value Fisher habitat and not the remaining portions of those units. Finally, the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

[70] This date was originally planned for August 2017.

23

Also on April 12, 2017, the Forest Service issued its determination that supplemental NEPA analysis must be prepared and the that the existing Rancheria Project's Decision Notice and Finding of No Significant Information must be reconsidered in light of new circumstances and information. Dkt.# 42-1 at 13. PSUMF 24. It stated that suspension of the Rancheria timber sale contract shall remain in place while this supplemental NEPA analysis and reconsideration are being conducted, and all implementation of the existing Decision Notice for the Rancheria Project is stayed until a further determination is made. Id. PSUMF 25. "Impacts of the Rancheria Project have not yet been fully analyzed, and will be addressed in more detail in supplemental NEPA analysis because of mortality within the project area and because of the project's location with respect to the Cedar Fire area." SF1261. PSUMF 26. The Rancheria Project area is located several miles to the south of the Cedar Fire area. See SF0047 (map of projects in relation to Cedar Fire). PSUMF 27. Other projects in the vicinity of the Frog Project include the Summit Project, the Rancheria Project, and the Bull Run Project. SF0038. PSMFO 28.[73]

### 21. Spear Creek Project

Even though the Spear Creek Project has not yet been finalized, the Forest Service released very specific plans to proceed with this 1,250 to 1,500 acre project since November of 2016. See SF1314-15 (discussing specifics about both the Bull Run and specific size and form of the Spear Creek project). PSMFO 29.[74] On May 1, 2017, the Forest Service issued a second scoping notice for the Spear Creek Project, which proposes the same exact project[75] along the same roads as described during initial scoping. See Voss Dec., Exhibit D (describing the same treatments as the

---

[71] The parties have signed a stipulation to wait until receiving this order before any logging (if allowed) can commence.

[72] The parties signed a stipulation file on August 25, 2017 to wait until September 20, 2017 before commencing any logging, with the understanding that the Court will issue its order before then (unless the Court permits the logging to commence earlier). Doc. No. 63.

[73] Defendants object that the phrase "in the vicinity" is vague and ambiguous.

[74] Defendants object that the phrase "very specific" is vague, ambiguous, and argumentative—not factual.

[75] Defendants object to the characterization "the exact same project" as argumentative and unsupported by the evidence cited. Defendants: Undisputed that the Forest Service issued a scoping notice for the Spear Creek project dated May 1, 2017.

24

original proposal and showing a map on the last page, which is identical to the one in SF1323, released with initial scoping). PSUMF 30.

When the SIR was prepared, the proposed Spear Creek Roadside Hazard Tree Project did not have specific acreage or prescriptions. SF_11. DSMFO 153.[76] The Forest Service found that including Spear Creek at the home-range scale was unnecessary because it will not overlap with hexagons affected by the Frog project and thus will not contribute to the 13 percent Conservation Strategy threshold for mechanical treatments. SF_11. DSUMF 154.[77] The Forest Service found that including Spear Creek at the Core scale was unnecessary because the project would primarily fell hazard trees along roads, which are considered lower quality habitat for Fishers. SF_11, 37; Cordes Decl. ¶ 27. DSMFO 155.[78] Summit CE, Bull Run, and Spear Creek will each receive their own environmental review and analysis, including consideration of cumulative effects. Second Voss Decl. (ECF No. 47-3) Ex. D, at 3; Cordes Decl. ¶ 27. DSMFO 156.[79]

### 22. Sequoia National Forest Plan

The Sequoia National Forest Plan includes a Desired Condition that "[w]ithin known or estimated female Fisher home ranges outside the [Wildland Urban Interface] ("WUI"), a minimum of 50 percent of the forested area has at least 60 percent canopy cover. Where home range information is lacking, use HUC 6 watershed as the analysis area for this desired condition." Record of Decision ("ROD") for the 2004 SNFPA, Appendix A at 41. Located in the Administrative Record as "AUR" (available upon request) just below SF1151. Relevant pages provided as Voss Dec., Exhibit C. PSUMF 58.[80] The Sequoia National Forest Plan Standard for

---

[76] Plaintiff: Objection. Misstates evidence. The Spear Creek Project was first scoped in late-2016 with a proposed size of 1,500 acres. SF1314. The November 30, 2016 letter from Eric LaPrice included a specific proposal "for a 300 ft. treatment area for each side of the road" and map showing each of the roadways in the Giant Sequoia National Monument portion of the Cedar Fire area where treatments were proposed. Id. & SF1323.

[77] Plaintiff: Undisputed that this is what the SIR asserts.

[78] Plaintiff: Undisputed that this is what the SIR asserts, except that the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

[79] Plaintiff: Objection. The Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

[80] Defendants object that this misstates evidence. The language is located in the 2004 Sierra Nevada Forest Plan Amendment.

thinning projects requires that

> For mechanical thinning treatments in mature forest habitat (CWHR types 4M, 4D, 5M, 5D, and 6) outside WUI defense zones:
> * * *
> • Design projects to avoid reducing pre-existing canopy cover by more than 30 percent within the treatment unit. Percent is measured in absolute terms (for example, canopy cover at 80 percent should not be reduced below 50 percent.)

Voss Dec., Exhibit C (ROD for the SNFPA, Appendix A at 50). PSUMF 59.[81]

The SIR's presentation of canopy changes is the same format used in the 2013 Environmental Assessment. Pl.'s Mot. Summ. J. (ECF No. 47), at 35; F_299, 323, 2027, 2050; SF_20, 28. DSUMF 160.[82] In its comments on the 2013 Environmental Assessment, SF Keeper never contended that the 2013 Environmental Assessment's presentation of canopy changes was inconsistent with the 2004 Sierra Nevada Forest Plan Amendment. F_1690–97. DSUMF 161.[83] Also in its comments on the 2013 Environmental Assessment, SF Keeper claimed the 2004 Sierra Nevada Forest Plan Amendment was illegal and should not be applied to Frog. F_1692. DSMFO 162.[84]

In the SIR and its supporting documents, the Forest Service affirmed that Frog was designed pursuant to the 2004 Sierra Nevada Forest Plan Amendment, which implemented specific standards and guidelines that would be beneficial in conserving habitat for species such as the Fisher, including provisions for maintenance of canopy closure. SF_36. DSUMF 163.[85] Minor adjustments in project implementation noted in the Frog Project Fuels Review will reduce

---

[81] Defendants object that this misstates evidence. The language is located in the 2004 Sierra Nevada Forest Plan Amendment as a Forest-wide Standard and Guideline.

[82] Plaintiff: Undisputed, except that there is no reference to this at Pl.'s Mot. Summ. J. Brief at 35.

[83] Plaintiff: Undisputed, except that sufficient canopy cover has been one of the primary issue expressed in comments when expressing concerns about the Frog Project. See F1657 ("The Revised EA does not properly evaluate the significant impacts of logging on … canopy cover…" and "The project allows logging of large trees up to 30" dbh and significant overall canopy cover reductions at the stand and landscape scale.")

[84] Plaintiff: Objection. Misstates evidence. Plaintiff did not claim that the Amendment was illegal, but referred to comments by the John Muir Project, stating that "Because the 2004 Framework has been deemed illegal, the Forest Service should be using the 2001 Sierra Nevada Framework for this project." Id.; see SF1700 ("The federal courts have ruled that the 2004 Framework forest plan is illegal under NEPA in two different decisions.").

[85] Plaintiff: Undisputed that the SIR and its supporting documents made this assertion.

the possibility of adverse effects. SF_15.  DSUMF 165.[86] The underlying data for the Forest

Service's SIR and its supporting materials were disclosed and available to SF Keeper at all times.

ECF No. 35, at 1; ECF No. 41-3, at 2.  DSMFO 166.[87]

### 23. Frog's Project Design Features

The Frog Project is a mechanical thinning project, which includes 26 treatment units

located in mature forest habitat (CWHR types 4M, 4D, 5M, 5D, and 6) and is located outside the

WUI and WUI defense zones. SF0022. PSMFO 60.[88]  Frog's project design features include

retaining at least 40 percent canopy cover. F_274, 304, 309.  DSMFO 71.[89]  Frog's project design

features include retaining all trees over 30 inches in diameter at breast height ("dbh") and all

hardwoods greater than or equal to 12 inches dbh (except hazard trees), which would ensure

adequate trees within the size range used by Fishers for rest sites. F_219. DSMFO 72.[90]

Frog's project design features include retaining at least 180 square feet of basal area per

acre, which exceeds the 150 square feet per acre suggested by the CBI in the Southern Sierra

Nevada Fisher Conservation Strategy ("Fisher Strategy") published in 2016. F_262; SF_193.

---

[86] Plaintiff: Undisputed, that the Fuels Review makes this assertion.

[87] Plaintiff: Objection. Misstates evidence. The Forest Service is referring to "geographic-information-system data supporting CBI's review and analysis of updated vegetation information" and "Forest Vegetation Simulator (FVS) data produced [in] December 2016 reflecting vegetation gathered as of July 2016." While the Forest Service did make the CBI data available to Plaintiff, it did not actually use the data in its analysis, stating that it "did not rely on or apply results from the new CBI management grid system analysis at [the] project level for the Frog project." SF0007. The FVS data produced in December 2016 is not useful to the Plaintiff in a way, because it "is run using the Suppose graphical user interface" (ECF # 41-3 at 2), which is both proprietary and unavailable to Plaintiff or the public.

[88] Defendants concede it is undisputed that the Frog project includes mechanical treatments in mature forest habitat (CWHR types 4M, 4D, 5M, 5D, and 6) located outside a WUI and WUI defense zone. Defendants object that this misstates evidence: the cited document shows 26 treatment units within the Frog project containing moderate to high-quality CWHR 2.1 Fisher habitat modeled in 2021 under pre- and post-wildfire conditions.

[89] Plaintiff: Undisputed that the 2001 design features include this goal, except that the 2016 Southern Sierra Nevada Fisher Conservation Strategy ("Fisher Strategy"), instead, suggests that, "[a]t the home range scale, >50% of a target cell supports tree canopy cover > 70% (as measured by EVEG), with dense stands patchily distributed in mosaic with patches of more open (<40% cover) and moderate (40-69%) canopy forest to provide habitat heterogeneity." SF_193.

[90] Plaintiff: Undisputed that the 2001 design features include this goal, except that the 2016 Fisher Strategy includes several additional "Fisher habitat elements," including large living and dead trees (snags), structures used by Fishers for resting and denning, snags in all size classes, and certain tonnages of large logs with some patches of high abundance. SF_194.

DSMFO 73.[91] Frog's project design features include retaining oak trees, which provide important habitat for Fishers and their prey. F_295–96. DSUMF 74.[92] Frog's project design features include imposing a "limited operating period" to avoid project activity when female Fishers and their offspring are least mobile and most vulnerable. F_623, 336. DSUMF 75.[93] There now remain 1,027 acres of Frog to be treated, and about 500 of these acres are in Fisher habitat. SF_63, 42, 8. DSUMF 79.

The Forest Service found that during the years between Frog's 2010 stand exams and July 2016, moderate and high-capability CWHR 2.1 habitat in the project area declined by only 2 percent, thus making new stand exams unnecessary. SF_47a, 8, SF_2; Cordes Decl. ¶ 10. DSMFO 132.[94] The Frog Project is treating fir stands between 6,500 and 8,000 feet in elevation, where mortality levels are much lower and the proposed treatments are expected to lower the competitive stress on individual trees and lessen future mortality. SF_16. DSMFO 133.[95]

The risk of a fire happening under adverse conditions in the Frog project area is very high. The type of treatments planned would create low surface fuel loads, significantly decreasing the probability of uncharacteristically severe wildfire effects while sustaining large trees and dense canopy cover suitable for Fisher habitat. SF_21. DSUMF 134.[96] Core Area 2 covers a wide geographic area, encompassing a number of different habitat types at different elevations which

---

[91] Plaintiff: Objection. Misstates evidence. The 2016 Fisher Strategy instead states that "[w]ithin each Fisher target cell, basal area of mixed-conifer forest averages > 150 ft2/ac, ranging from ~ 100 ft2/ac to >400 ft2/ac at finer scales, depending on site conditions." SF_193. Plaintiff concedes that it is undisputed that the 2001 design features include this goal.

[92] Plaintiff: Undisputed that the 2001 design features include this goal.

[93] Plaintiff: Undisputed that the 2001 design features include this goal.

[94] Plaintiff: Undisputed that the cited references makes those assertions, but the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

[95] Plaintiff: Undisputed that the Silvicultural Review makes that assertion; however, Plaintiff disputes that the mortality levels are "much lower" in those areas, which is contradicted by the GoogleEarth aerial photographs and the Forest Service's own Aerial Detection Survey data. See ECF # 47-5 (2nd Sheehey Decl. Ex. C); ECF # 47-4 (2nd Hanson Decl. Ex. B). [NOTE: The Court declines to review these declarations since as set forth below, the Court denied Plaintiff's request to admit the second declarations of Dr. Chad Hanson and Ms. Alison Sheehey. Any facts relying solely on these declarations will not be considered by the Court.]

[96] Plaintiff: Undisputed that the Revised Fisher BE makes that assertion.

are not impacted equally by the current mortality event. SF_10.  DSUMF 135.

**24. The Forest Service's Findings on Fisher Dispersal Routes During Frog**

The Forest Service found that Frog's treatments would not cause barriers to movement across the Fisher home ranges (or "cells") overlapping the project area. SF_27. DSUMF 136.[97] Connectivity between home ranges will be maintained throughout the implementation of Frog by design criteria, including riparian zones and no treatments areas. The inclusion of untreated areas along steep sloped regions and riparian corridors will maintain habitat connectivity and Fisher dispersal routes both within and outside of the Frog project area. SF_28.  DSUMF 137.[98]  Frog will use existing timber landings to minimize disruption of the vegetative covers used for dispersal of Fishers. Dense cover is also retained along stream corridors and other features outside of the units. SF_28.  DSUMF 138.[99]

The Forest Service identified and assessed Frog's effects on Fisher habitat characteristics in the project area, including canopy closure and other Fisher habitat components in the CWHR classification system, such as tree types and tree size. SF_22–25.  DSMFO 139.[100] Tree size and canopy correlate with basal area. SF_17.  DSMFO 140.[101]  CBI's March 2017 guidance document describes a "stand scale" analysis as representing "the availability of individual habitat features within the project area." SF_57.  DSMFO 141.[102]  CBI's March 2017 guidance document recognizes that "short-term risk may be necessary to meet longer term conservation and resiliency

[97] Plaintiff: Undisputed that the Revised Fisher BE makes that assertion at SF0028.

[98] Plaintiff: Undisputed that the Revised Fisher BE makes that assertion.

[99] Plaintiff: Undisputed that the Revised Fisher BE makes that assertion.

[100] Plaintiff: Objection. Misstates facts. The pages referenced are of various charts, which tabulate the amount of CWHR 2.1 habitat for the no action and action alternatives after a decade of growth. Id. They do not assess the Frog Project's effects in the project area, they do not directly identify Fisher habitat characteristics, and they do not identify canopy closure.

[101] Plaintiff: Objection. Misstates facts. The cited page asserts that there is a correlation between basal area and canopy cover: "180 square feet basal area per acre (correlates to 45% canopy cover)." SF0017.

[102] Plaintiff: Undisputed that the CBI guidance refers to stand scale in that way; however, "stand scale" must be able to distinguish "individual habitat features within the project area" which may be different than the project area as a whole. The commonly-accepted definition of a forest stand is "a contiguous community of trees sufficiently uniform in composition, structure, age and size class distribution, spatial arrangement, site quality, condition, or location to distinguish it from adjacent communities." Nyland, Ralph D. (2007). Silviculture: concepts and applications, 2nd ed. Prospect Heights: Waveland Press.

objectives." SF_58. DSUMF 142.[103]

### 25. The Forest Service's Review of the Cedar Fire Area

The Forest Service compared vegetation levels before and after the Cedar Fire to identify areas of habitat change at or above 50 percent. The Forest Service excluded these areas from calculations of CWHR 2.1 and high-value reproductive habitat. SF_11, 47a (ECF No. 41-4). DSUMF 143.[104] The Forest Service found that the Cedar Fire resulted in a loss of less than 5 percent of both CWHR 2.1 and CBI habitat in Fisher Core Area 2 and concluded that the effects of the fire alone were not likely to threaten the viability of the sub-population. SF_10. DSUMF 144.[105] The Forest Service determined that Fishers south of the Cedar Fire area may be at greater risk in the long-term due to isolation. SF_10. DSUMF 145.[106] The Frog project sits north of the Cedar Fire and remains connected with the Core Area 2 of the Sierra Fisher sub-population. SF_46–47. DSMFO 146.[107]

Vegetation data are not updated systematically and frequently enough to predict changed habitat for project planning purposes. SF_55, 1261; Cordes Decl. ¶ 21. DSMFO 147.[108] The Forest Service appraised ongoing mortality qualitatively at the cumulative-effects scale and found that Frog would not significantly impact or contribute to a loss of Fisher viability in Core Area 2. SF_9–10; Cordes Decl. ¶ 21. DSMFO 148.[109] The Forest Service expects that implementing Frog will help curb the mortality rates observed at lower elevations in the project area. SF_10; Cordes

---

[103] Plaintiff: Undisputed that the guidance includes this opinion.

[104] Plaintiff: Undisputed that the Forest Service asserts this.

[105] Plaintiff: Undisputed that the Forest Service asserts this.

[106] Plaintiff: Undisputed that the Forest Service asserts this.

[107] Plaintiff: Objection. Misstates evidence. This citation is of two maps, which show the various projects and the Cedar Fire area in relation to the Core 2 area. While the Frog Project is north of the Cedar Fire and it is in the Core 2 area, the other projects and the Cedar Fire area still remain within and connected to the Core 2 area.

[108] Plaintiff: Undisputed, except that the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

[109] Plaintiff: Undisputed, that the Forest Service only appraised ongoing mortality qualitatively and that it asserts there would be no loss of viability on this basis, except that the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

Decl. ¶ 22. DSMFO 149.[110] In the SIR, the Forest Service confirmed that any impacts to Fishers

from further mortality would be monitored and addressed as new vegetation data becomes

available. SF_10; Cordes Decl. ¶ 22. DSMFO 150.[111]

Some available estimates of tree mortality rates provide ranges of 2,000 to 14,000 dead

trees per square mile within 6.5 square mile grid cells. SF_1274, 1276. DSUMF 151.[112] The

Forest Service and its experts recognize the dramatic extent of tree mortality across the landscape,

as well as uncertainty about how Fisher population processes writ large might respond over time.

SF_9–10, 54. DSUMF 157. Frog consists of 26 small, scattered units with less than 1 square mile

of Fisher habitat combined. SF_42, 63, 8. DSUMF 152.[113] Frog's treatments are well understood

and are not so uncertain or unknown as to present potentially significant effects. SF_1261; Cordes

Decl. ¶ 25. DSMFO 158.[114]

## LEGAL STANDARD

### A. NEPA Requirements

"NEPA is a procedural statute that requires the federal government to carefully consider

the impacts of and alternatives to major environmental decisions. 42 U.S.C. §§ 4321, 4331. Its

purpose is to ensure that federal agencies take a 'hard look' at the environmental consequences of

their proposed actions before deciding to proceed." Native Ecosystems Council v. Weldon, 697

F.3d 1043, 1051 (9th Cir. 2012) (citing to Robertson v. Methow Valley Citizens Council, 490 U.S.

---

[110] Plaintiff: Undisputed, that the Forest Service makes this assertion, except that the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

[111] Plaintiff: Undisputed, except that the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

[112] Plaintiff: Undisputed, which is equivalent to a tree mortality rate ranging from roughly 3 to 22 dead trees per acre (at 640 acres per square mile).

[113] Plaintiff: Undisputed, except that "small" is a vague and relative term. The units range from roughly 20 to 60 acres in size and many are contiguous with each other. See SF0022 & 42.

[114] Plaintiff: Objection. Misstates evidence. The SIR itself does not address the uncertainty, which is expressed in a letter to Plaintiff. That letter references three scientific studies, which are unrelated to drought-related tree mortality or Fishers to minimize the highly uncertain nature of the potential effects express by the Forest Service's own Fisher experts. SF1261; see SF0439, 0446, and 0273 (studies). Moreover, the Court may not rely on the post hoc declaration of Jeff Cordes, which is not in the record.

332, 350–51 (1989)). To do so, an agency may prepare an Environmental Assessment—a "concise public document" that briefly provides sufficient evidence for the agency either to issue a Finding of No Significant Impact (also referred to as a "FONSI"), or an Environmental Impact Statement (also referred to as an "EIS") that further analyzes significant impacts on the environment. See 40 C.F.R. §§ 1501.4, 1508.9. "Although NEPA establishes procedures by which agencies must consider the environmental impacts of their actions, it does not dictate the substantive results of agency decision making." Native Ecosystems Council, 697 F.3d at 1051.

Under NEPA, an agency must supplement an Environmental Assessment or EIS if new information shows "that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered." Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 374 (1989) (alteration in original, citation omitted). "[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized." Id. at 373; see also Japanese Vill., LLC v. Fed. Transit Admin., 843 F.3d 445, 459 (9th Cir. 2016) (same). "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." Marsh, 490 U.S. at 373; see also Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 554–55 (1978) ("Administrative consideration of evidence . . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated [and, we might add, the time the decision is judicially reviewed] . . . . If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.") (citation omitted); Japanese Vill., LLC, 843 F.3d at 466 (same).

When new information surfaces, an agency may satisfy NEPA by "carefully consider[ing] the information, evaluat[ing] its impact, and support[ing] its decision not to supplement . . . with a statement of explanation or additional data" i.e., a Supplemental Information Report. Animal Def. Council v. Hodel, 840 F.2d 1432, 1439–40 (9th Cir. 1988), modified, 867 F.2d 1244 (9th Cir.1989); see also Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp., 113 F.3d 1505,

1510 (9th Cir. 1997) (citing to *Animal Def. Counsel* and noting that "agency decision not to supplement EIS in light of new information was reasonable where agency 'carefully considered the information, evaluated its impact, and supported its decision not to supplement with a statement of explanation.'")

### B. Summary Judgment Under the APA for Agency Decisions Under NEPA

Section 706 of the Administrative Procedure Act ("APA") governs judicial review of agency decisions made pursuant to NEPA. 5 U.S.C. § 706; City of Sausalito v. O'Neill, 386 F.3d 1186, 1205–06 (9th Cir. 2004). Summary judgment is governed by the APA's "arbitrary and capricious standard" instead of the typical summary judgment standard that determines whether there are disputed issues of material fact. See Alaska Wilderness League v. Jewell, 788 F.3d 1212, 1217 (9th Cir. 2015) ("We review the grant of summary judgment de novo, thus reviewing directly the agency's action under the [APA's] arbitrary and capricious standard."); Nw. Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1472 (9th Cir. 1994) ("As mentioned previously, this case involves review of a final agency determination under the [APA] therefore, resolution of this matter does not require fact finding on behalf of this court. Rather, the court's review is limited to the administrative record . . . .")[115]

Under the APA, the reviewing court may set aside agency actions only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv., 460 F.3d 1125, 1132 (9th Cir. 2006) (same). "An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law." Organized Vill. of Kake v. U.S. Dep't of Agric., 746 F.3d 970, 974 (9th Cir.

---

[115] "The court reviews final agency actions under the [APA]. The court does not determine whether there are disputed issues of material fact as it would in a typical summary judgment proceeding; its review is based on the administrative record. 5 U.S.C. § 706(2)(F); [*Nw. Motorcycle Ass'n,* 18 F.3d at 1472]; *see also South Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F.Supp.2d 1247, 1256 (E.D.Cal.2010) (usual summary judgment standards do not apply). The court must consider whether the agency's actions, findings and conclusions are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law....' 5 U.S.C. § 706(2)(A)." W. Watersheds Project v. Bureau of Land Mgmt., 971 F. Supp. 2d 957, 968–69 (E.D. Cal. 2013).

2014), <u>on reh'g en banc</u>, 795 F.3d 956 (9th Cir. 2015) (citation omitted).

"The arbitrary or capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity. Although the court's inquiry must be searching and careful, ... the ultimate standard of review is a narrow one. Thus, [e]ven when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may be reasonably discerned. It is not the reviewing court's task to make its own judgment about the appropriate outcome . . . . The court's responsibility is narrower: to determine whether the agency complied with the procedural requirements of the APA." <u>San Luis & Delta-Mendota Water Auth. v. Locke</u>, 776 F.3d 971, 994 (9th Cir. 2014) (citations and internal quotations omitted).

"[W]hile [courts] carefully scrutinize an agency's actions under NEPA, [courts] must be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency." <u>Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy</u>, 860 F.3d 1244, 1254 (9th Cir. 2017) (citations omitted). "A court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise. *See Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). The court is not to 'act as a panel of scientists that instructs the [agency] ..., chooses among scientific studies ..., and orders the agency to explain every possible scientific uncertainty.' [Citation]." <u>N. Plains Res. Council, Inc. v. Surface Transp. Bd.</u>, 668 F.3d 1067, 1075 (9th Cir. 2011). "And '[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.' [Citation] (quoting [*Marsh*, 490 U.S. at 378])." <u>N. Plains Res. Council, Inc.</u>, 668 F.3d at 1075. "Agencies are normally entitled to rely upon the reasonable views of their experts over the views of other experts." <u>Ground Zero Ctr. for Non-Violent Action</u>, 860 F.3d at 1254.

**A. Whether the Frog Project Violates NEPA**

    a. <u>Whether the Forest Service Failed to Consider Significant New Circumstances</u>

SF Keeper argues that the Frog Project violates NEPA because the Forest Service failed to consider "significant" new circumstances as enumerated below. On April 12, 2017, the Forest Service released a SIR signed by the Forest Supervisor stating in part that: "I have carefully considered the information pertaining to vegetation changes from tree mortality and recent wildfires provided above. These changes are not significant . . . . The existing environmental analysis is adequate to support the original decision. The information included in this SIR validates that position." SF_13. For the reasons that follow, the Court finds that Defendants have not violated NEPA.

    i. <u>Canopy Cover Reductions</u>

SF Keeper has "raised concerns that the massive tree die-off could adversely affect the suitability of Fisher habitat by reducing canopy cover even before logging." Pl's Mtn at 15 (citing to SF1279 (comments)); SF1515-15 (Dr. Barrett Dec. ¶ 14) & SF1459-60 (1st Dr. Hanson Dec. ¶¶ 12-13 (because canopy cover has changed due to the die-off, the impacts from proposed logging must be re-analyzed at the stand level)). SF Keeper argues that the Forest Service has failed to determine or disclose current canopy cover reductions from the tree die-off as well as canopy cover reductions from subsequent Project activities at the stand or treatment unit level. SF Keeper argues that canopy cover is essential: "Fishers are associated with moderate to dense forest canopy. The most consistent predictor of fisher occurrence at large spatial scales was moderate to high amounts of contiguous canopy cover rather than specific habitat type. Research has suggested that inadequate canopy cover limits fisher distribution across forest types and ecoregions." F00282 (Frog Fisher BE); <u>see also</u> SF1515 (Dr. Barrett Dec. at ¶ 12).

The Forest Service used its own methodology to analyze canopy cover. In Frog's 2013 Environmental Assessment and supporting documents, existing canopy in the project area was

---

[116] To the extent that either party bases an argument solely on extra-record evidence which the Court declines to admit as set forth in Section II, the Court will not address such arguments.

determined using habitat information that was current as of 2010. SF_3, 4. Therefore, even though operations would not begin until after 2013, Frog's environmental analysis referred to "2010" as the baseline in the project area. F_299, 304, 309 ("Figure 3 displays the anticipated decrease in canopy cover from existing condition [labeled "2010"] to those expected post treatment."). In other words, "2010" does not literally refer to calendar year 2010—it is "Year 0" of project implementation. Similarly, "2030" and "2060" refer to Years 20 and 50 from project implementation, respectively. See F_299, 304.

For consistency, Frog's 2017 SIR and its underlying materials follow this convention and identify "2010" as "Year 0" for project implementation. SF_20–21, 24–25, 28–29, 42, 44. Because the SIR uses updated EVEG data that reflects recent mortality (SF_1–3, 11, 19, 47a [ECF No. 41-4]), canopy closure at "Year 0" is reduced from the levels previously analyzed, showing approximately 45 percent instead of 51 percent canopy closure in CWHR 2.1 habitat. F_192, 299 & SF_20. Consistent with CBI's guidance (which largely follows the approach in the 2013 Environmental Assessment), the Forest Service projected this updated, existing canopy closure into the future using different scenarios (implementation, no-action, wildfire) and spatial scales. See, e.g., SF_58–59, 20–21, 28–29, 42–45.

Therefore, SF Keeper is incorrect when it claims the Forest Service did not consider how baseline canopy has changed since the 2013 EA, i.e., "the amount of canopy cover reduction from tree mortality prior to logging," and "how the Frog Project will further reduce canopy cover." SF Keeper fails to recognize that "2010" refers to the existing conditions at the time of project implementation (not calendar year 2010), which the Forest Service updated to reflect mortality and other changes since the 2013 EA.

The Court finds that Defendants' actions in addressing canopy cover were not arbitrary or capricious.

ii. Future Tree Mortality and Current or More Recent Vegetation Data

SF Keeper argues that Defendants failed to adequately consider and analyze predicted future tree mortality. SF Keeper further argues that Defendants improperly relied on existing vegetation data obtained in July 2016 for Defendants' analysis completed in March 2017. SF

Keeper argues that many more trees died during the summer and fall of 2016 and claims that the Forest Service should have used new data from November 2016, which show "an additional 36 million dead trees."

As an initial matter, the claimed "new data" of an additional 36 million dead trees is a figure from Aerial Detection Surveys that simply tally the number of dead trees observed during flights over millions of acres across the entire state of California. SF_1287, 92–98.19. This is not a new EVEG layer for the Sequoia National Forest, which is a much more precise and detailed analysis. The Forest Service updated its baseline vegetation and habitat information by (1) obtaining high-resolution aerial imagery of the Sequoia National Forest in mid-July 2016, and then (2) converting these images into a computer-generated map of existing vegetation for the Forest, which captures information about Fisher habitat components ("CWHR"). SF_11, 19, 47a. Creating a new EVEG layer took many months to generate, with the requisite habitat information. SF_1298; ECF No. 29, at 1-2. The Forest Service then provided CBI with this new EVEG layer in December 2016. SF_1298. The Forest Service and CBI used the same EVEG layer generated in December 2016 from images captured in July 2016, which provided the most reliable information available for project analysis. SF_8, 9. This information confirmed that during the worst years of the drought, moderate and high-capability CWHR 2.1 habitat in the Frog project area declined by only 2 percent. SF_8.

The Forest Service used satellite imagery to determine that any difference in data between July and October 2016 was very minimal – specifically "less than 1 percent due to mortality." SF_47a (ECF No. 41-4). The District Ecosystem Manager also reviewed the updated vegetation data and, along with observations of the distribution of mortality in the project area, concluded that Frog's prescriptions remained valid. SF_2, 14–17. The Forest Service found that mortality is not uniformly distributed—particularly at Frog's higher elevations—and attempting to use "rough" mortality rates in Frog's small, scattered units would be speculative. SF_9–10, 1260–61. The Forest Service acknowledged and qualitatively appraised continuing mortality rather than generate numbers that would be unhelpful at best, and potentially misleading. Id.; Idaho Rivers United v. U.S. Army Corps of Eng'rs, 2016 WL 498911, at *17 (W.D. Wash. Feb. 9, 2016)

37

("NEPA does not require agencies to include speculative information.").

   In the SIR, the Forest Service acknowledged that tree mortality will likely continue in California for at least 1 to 3 years, reducing habitat quality in general. SF_9. The Forest Service further acknowledged that vegetation data are not updated systematically and frequently enough to predict changed habitat for project planning purposes. SF_1261. However, based on estimated mortality rates (*e.g.*, SF_1272, 1274), the Forest Service appraised ongoing mortality qualitatively at the cumulative-effects scale and found that Frog would not significantly impact or contribute to a loss of Fisher viability in Core Area 2. SF_9–10 ("While ongoing tree mortality is likely to further lower habitat quality, impacts to fisher habitat from this predicted future mortality is speculative at best. In any event, there is no indication that implementation of the Frog Project would significantly impact or would contribute to a loss of viability of Fishers at the Fisher Core Area 2 scale.") At the project level, Frog is expected to help curb the mortality rates observed at lower elevations in the project area. SF_10. The Forest Service also confirmed that "[t]he impact of further tree mortality on Fisher habitat will continue to be monitored and addressed as necessary, as more quantifiable information (i.e., new vegetation data) becomes available." SF_10; Wilderness Soc'y v. Salazar, 603 F. Supp. 2d 52, 61–62 (D.D.C. 2009) ("That defendants may continue to assess impacts as more information becomes available does not indicate that defendants failed to take a 'hard look' at the environmental consequences of its proposed action . . . ."); see also N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1154 (9th Cir. 2008) (finding "no fault" with the decision to reevaluate impacts "[o]nce additional information . . . was available").

   While SF Keeper argues that the Forest Service should have used estimated mortality rates in a more "quantitative" fashion, the Forest Service maintains that such estimates are very imprecise (*e.g.*, anywhere from 2,000 to 14,000 trees per square mile) and apply indiscriminately across 6.5 square mile "grid cells." SF_1274, 1276. On the other hand, Frog consists of 26 small, scattered units with less than 1 square mile of fisher habitat combined. SF_42, 63, 8. Based on the administrative record, it would be speculative to guess the number and locations of trees that might die in fisher habitat in or near the project, if any. SF_9, 10 (noting further that Core Area 2

contains "a number of different habitat types at different elevations which are not impacted

equally" by tree mortality). The Forest Service reasonably found this exercise was not useful for

analyzing Frog's effects on Fishers. SF_9; Idaho Rivers United, 2016 WL 498911, at *17 (W.D.

Wash. Feb. 9, 2016) ("NEPA does not require agencies to include speculative information."); see

also Hapner v. Tidwell, 621 F.3d 1239, 1245 (9th Cir. 2010) (upholding an EA that did not

analyze effects on climate change because the project "involve[d] a relatively small amount of

land [1,100 acres, or 1.7 square miles] and it would thin rather than clear cut trees," and thus

discussing its possible climate-change effects would be "meaningless").

Such action by Defendants is not arbitrary or capricious. See Vill. of Bensenville v.

F.A.A., 457 F.3d 52, 71 (D.C. Cir. 2006) (holding that the agency's method of "creating its

models with the best information available when it began its analysis and then checking the

assumptions of those models as new information became available" was reasonable given the

"many months required to conduct full modeling with new data").

iii.   Uncertain and Unknown Risks on Fishers

SF Keeper argues that neither the SIR nor the Revised Fisher BE address the "highly

uncertain and unknown risks from the tree die-off and logging activities on the Fishers.

NEPA requires agencies to consider "the *degree* to which an action may adversely affect a

. . . species or critical habitat." Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1012

(9th Cir. 2006) (emphasis in original). "[I]t does not follow that the presence of some negative

effects necessarily rises to the level of demonstrating a significant effect on the environment. We

decline to interpret NEPA as requiring the preparation of an EIS any time that a federal agency

discloses adverse impacts on wildlife species or their habitat or acknowledges information

favorable to a party that would prefer a different outcome. NEPA permits a federal agency to

disclose such impacts without automatically triggering the 'substantial questions' threshold."

Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1240 (9th Cir. 2005).

"[T]he regulations do not anticipate the need for an EIS anytime there is some uncertainty,

but only if the effects of the project are 'highly' uncertain." Envtl. Prot. Info. Ctr., 451 F.3d at

1011 (citations omitted); see Native Ecosystems, 428 F.3d at 1240 ("Simply because a challenger

1   can cherry pick information and data out of the administrative record to support its position does

2   not mean that a project is highly controversial or highly uncertain."); see also 40 C.F.R. §

3   1508.27(b)(5).

4        The Ninth Circuit has recognized that there is a "quotient of uncertainty" which is present

5   in every prediction about the natural world. For example, in Ctr. For Biological Diversity v.

6   Kempthorne, 588 F.3d 701 (9th Cir. 2009) the Ninth Circuit rejected the argument that a

7   regulation affecting polar bears was "highly uncertain" because of the species' increasing

8   vulnerability from global warming, holding: "Although the specter of climate change made the

9   Service's prediction less certain than it would be otherwise, such uncertainty is not 'high

10  uncertainty,' but only that quotient of uncertainty which is always present when making

11  predictions about the natural world. . . . Again, we grant the Service great deference as it made a

12  scientific prediction within the scope of its technical expertise. The Service committed no clear

13  error in deciding not to produce an EIS." Id. at 712 (citations omitted); Envtl. Prot. Info. Ctr. v.

14  U.S. Forest Serv., 451 F.3d 1005, 1010 (9th Cir. 2006) (finding that predicted harm to spotted

15  owls was not so uncertain as to require an EIS where the U.S. Forest Service forecasts were based

16  on the extrapolation of existing owl nesting data); see also W. Watersheds Project v. Bureau of

17  Land Mgmt., 552 F. Supp. 2d 1113, 1136 (D. Nev. 2008) ("Although the [Environmental

18  Assessment] indicates there are difficulties in determining environmental consequences and

19  making accurate projections of the number of acres impacted, these statements do not show the

20  effects of the project are highly uncertain. Rather, the statements outline the difficulties in

21  evaluating the environmental consequences.").

22       Frog's remaining work will occur on 1,027 acres, or 0.4 percent of the 213,321 acres in

23  Core Area 2 of the southwestern tip of the Sierra Nevada and Greenhorn Mountains. SF_31, 63.

24  Of those 1,027 acres, about half are in Fisher habitat, or 0.4 percent of the 109,919 acres of

25  CWHR 2.1 habitat in Core Area 2. SF_31, 63, 8. In the worst years of the drought, moderate and

26  high capability CWHR 2.1 habitat declined only 2 percent in the project area. SF_8. Implementing

27  Frog will thin canopy by an average of 3 percent (in absolute terms) and thereafter canopy is

28  projected to recover within a more resilient habitat. SF_8–10. Frog's project units are very small

compared to a Fisher home range (2,560 acres), such that displacement of an individual is unlikely even in the short term. SF_22, 39. See Envtl. Prot. Info. Ctr., 451 F.3d at 1010 ("NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species.").

Additionally, Frog incorporates a number of design features to avoid impacts to Fishers during and after implementation. SF_17; F_219, 262, 274, 295-96, 304, 309, 336, 623. Frog's treatments are also "well understood and are not so uncertain or unknown as to present potentially significant effects." SF_1261; In Def. of Animals v. U.S. Dep't of Interior, 751 F.3d 1054, 1073 (9th Cir. 2014) (holding that a roundup of almost 2,000 wild horses and burros, while "unprecedented in scope," was not "highly uncertain" because the effects of roundups were "well known" to the agency). The Forest Service and its experts recognize the dramatic extent of tree mortality across the landscape, as well as uncertainty about how Fisher population processes writ large might respond over time. SF_9–10, 54. Core Area 2 covers a "wide geographic area" that was not uniformly affected by tree mortality. SF_1260, 1328.

While there have been changes in the landscape, the Forest Service's Fisher experts have determined that "increasing the resilience of the remaining patches of large living conifers will be important to providing for the long-term persistence of the Fisher population." SF_54. Defendants maintain that this is the purpose of Frog. SF_10 ("Implementation of treatments in the Frog Project is expected to help curb the rate of mortality in the project area."); SF_21 (finding "the risk of taking no action to be a greater threat to Fisher[s] and their habitat than a series of modeled fuel reduction projects with activities similar to the Frog Project").

The Ninth Circuit has held that "where the Forest Service has determined that stand treatments are clearly needed to reduce risks [and] will clearly result in greater assurance of long term maintenance of habitat, . . . we should be loathe to second guess their efforts." League of Wilderness Defs. v. Allen, 615 F.3d 1122, 1134 (9th Cir. 2010); see also Sequoia ForestKeeper, 2016 WL 5235118, at *9 (holding that "differences in opinion on the values of mutually recognized long and short term goals and risks . . . is not proper subject matter for determination

41

1    by a district court in an action under NEPA"). The Court finds that the Forest Service has not

2    acted arbitrarily or capriciously.

3              iv.   New Conservation Measures and Connectivity Concerns Due to Cedar Fire

4          SF Keeper argues that due to the massive tree die-off, Defendants should have, but failed

5    to (1) consider the new "conservation measures" and (2) analyze the effects on several key Fisher

6    "habitat characteristics" stressed in *Changed Circumstances and Implementation of the Southern*

7    *Sierra Fisher Conservation Strategy Notes from the Authors' March 2017*. Pl's Mtn at 22. SF

8    Keeper asserts that the Forest Service's analysis of habitat in the project area "cannot be

9    considered" a "'stand-scale' analysis." Further, SF Keeper argues that Defendants have failed to

10   consider potentially significant effects on Fisher habitat after the Cedar Fire, which burned

11   adjacent to the Frog Project area.

12         As to conservation measures for connectivity, the Forest Service found that Frog's

13   treatments would not cause barriers to movement across the Fisher home ranges (or "cells")

14   overlapping the project area. SF_27 (citing Table 5 at SF_28 and Map 2 at SF_43). Connectivity

15   between home ranges "will be maintained throughout the implementation of [Frog] by design

16   criteria . . . including riparian zones and no treatments areas. The inclusion of untreated areas

17   along steep sloped regions and riparian corridors will maintain habitat connectivity and fisher

18   dispersal routes both within and outside of the Frog Project area." SF_28 (noting further that

19   "[t]he Frog Project will use existing timber landings to minimize disruption of the vegetative

20   covers used for dispersal of Fisher[s]. Dense cover is also retained along stream corridors and

21   other features outside of the units").

22         Frog's Environmental Assessment found that "[h]abitat adjacent to the Frog Project has

23   been severely fragmented and isolated by past large fires." F_190, 213–14. The Forest Service

24   found that implementing Frog is itself a means of protecting home-range connectivity "from

25   uncharacteristically severe fire and not contribut[ing] to further fragmentation." SF_27–28.

26   Accordingly, potential fragmentation near Frog does not "show a 'seriously different picture of the

27   likely environmental harms stemming from the proposed project.'" Tri-Valley CAREs v. U.S.

28   Dep't of Energy, 671 F.3d 1113, 1130 (9th Cir. 2012).

Further, the Forest Service did conduct some analysis pursuant to their own methods on the "stand level." See SF_ 20, 57–58 (SF_57 describes "stand level" as "represent[ing] the availability of individual habitat features within the project area"). The Forest Service identified and assessed Frog's effects on fisher habitat characteristics in the project area. These include canopy closure as well as other fisher habitat components in the CWHR classification system, such as tree types (*e.g.*, Montane Hardwood Conifer ["MHC"] and Sierran Mixed Conifer "[SMC"]) and tree size (*e.g.*, trees measuring 11 to 24 inches dbh [Class "4"] and greater than 24 inches dbh [Class "5"]). See SF_22–25. Tree size and canopy correlate with basal area (SF_17), and project design criteria further call for the retention of habitat components such as hardwoods greater than or equal to 12 inches dbh, snags greater than 15 inches dbh, and 180 square feet basal area per acre. SF_17; F_219.

The Forest Service also weighed Frog's costs and benefits, sharing CBI's view that "short-term risk may be necessary to meet longer term conservation and resiliency objectives." SF_58. The Forest Service acknowledged, for example, that Frog may result in a slight, short-term drop in canopy and that individual fishers may leave units during thinning. SF_25–26. The Forest Service also confirmed that Frog will maintain overall habitat suitability and prohibit thinning during the fisher birthing and rearing season. SF_26, 34. Ultimately, Defendants determined that Frog "would result in only limited habitat disturbance" while providing long-term habitat resilience against fire, drought, and insects. SF_26, 34 (confirming Frog will "improve fisher habitat resiliency while retaining key fisher habitat characteristics").

The Forest Service compared vegetation levels before and after the Cedar Fire to identify areas of habitat change at or above 50 percent. SF_11, 47a (ECF No. 41-4). The Forest Service then excluded these areas from calculations of CWHR 2.1 and high-value reproductive habitat. SF_11, 47a (ECF No. 41-4). Using this approach, the Forest Service found that the Cedar Fire "resulted in a loss of about two percent of the CWHR 2.1 habitat and two percent of the CBI [high-value reproductive] habitat available to the southern Sierra fisher sub-population. Within just fisher Core Area 2, this represents a loss of less than five percent of both CWHR 2.1 and CBI habitat." SF_10.

The Forest Service further determined that "[t]he effects of this fire alone are not likely to threaten the viability of the sub-population, but the changes in vegetation caused by the Cedar fire have isolated the fisher population in the southern Greenhorn Mountains." SF_10. Consequently, "Fishers south of the Cedar Fire area may be at greater risk in the long-term due to this isolation." SF_10. Unlike the Rancheria project, however, Frog sits north of the Cedar Fire and is still connected with the Core Area 2 of the Sierra fisher sub-population. SF_46–47; see also SIR— Rancheria Project (ECF No. 42-1), at 10 ("Fishers south of the Cedar fire, including the Rancheria project area[,] may be at greater risk . . . due to this isolation."). Defendants have determined that Frog's implementation would not render currently suitable habitat unsuitable, and thus would not create breaks in habitat across fisher home ranges overlapping the project area. SF_9 (finding that the "minor changes [from Frog's implementation] would not significantly alter the availability or configuration of fisher habitat at the home range" or "threaten connectivity").

Frog's Environmental Assessment noted that the project could temporarily displace individual Fishers during treatment, although such displacement was unlikely. F_225. The Environmental Assessment also found that displacement was unlikely to result in individual mortality "with areas of adjacent suitable habitat." F_197. After the Cedar Fire, Frog remains connected to Core Area 2, and Frog's possible displacement effects are not "significantly different" than previously considered. See Idaho Wool Growers Ass'n v. Vilsack, 816 F.3d 1095, 1107 (9th Cir. 2016). SF_10, 46–47; cf. ECF No. 42-1, at 10 (Rancheria project area).

The Court finds that Defendants have not acted arbitrarily or capriciously in regards to new conservation measures and potential connectivity concerns based on the Cedar Fire.

v.   Stand Exam Data

SF Keeper argues that in light of tree mortality and vegetation changes, Defendants should have gathered and analyzed new stand exam data (i.e., physical inspections of each of the project units containing the 1,027 acres remaining in Frog) to ensure that the Frog Project can still meet silvicultural goals.

The National Forests "have never been, and will never be, static"—"new information and changed circumstances are the norm." SF_1329. The Forest Service is correct that it need not

conduct new stand exams whenever changes occur in the project area, and "[t]o require otherwise would render agency decisionmaking intractable." Marsh, 490 U.S. at 373; see SF_1329 (explaining that the forest is dynamic, and tree mortality is one of the challenges to forest management).

The Forest Service found that during the years between the 2010 stand exams and July 2016 (*i.e.*, the worst years of the drought), moderate and high-capability CWHR 2.1 habitat in the project area declined by only 2 percent, and thus determined that new stand exams were unnecessary. SF_47a, 8; see also SF_2 (confirming that silvicultural prescriptions are still valid). CWHR 2.1 includes habitat components such as tree species, size, and canopy density, which correlate with other habitat characteristics such as basal area. F_274, 102; SF_17. The Forest Service also used satellite imagery to confirm that any difference in data between July and October 2016 was minimal. SF_47a (ECF No. 41-4).

According to the Ecosystem Manager and the Fuels Officer for the Western Divide Ranger District, "[t]he Frog Project is treating fir stands between 6,500 and 8,000 feet in elevation, where mortality levels are much lower and the proposed treatments are expected to lower the competitive stress on individual trees and lessen future mortality." SF_16 (Frog Project Silvicultural Review dated April 3, 2017); accord SF_14 (Revised Frog Project Fuels Review dated April 3, 2017). This is consistent with observations of the Regional Forester in August 2016: "Tree mortality has not been uniform across the Sierra Nevada, such that the approaches we use may vary by locale." SF_1328; see also SF_10 ("Core Area 2 covers a wide geographic area, encompassing a number of different habitat types at different elevations which are not impacted equally by the current mortality event."). Under these circumstances, the Forest Service's decision to rely on updated EVEG and CWHR habitat and field observations of its own experts rather than conduct another round of stand exams for the entire project was not arbitrary or capricious. Lands Council v. McNair, 629 F.3d 1070, 1074 (9th Cir. 2010) ("[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts."); Sequoia ForestKeeper v. La Price, No. 16-759, 2016 WL 5235118, at *8 (E.D. Cal. Sept. 22, 2016) (holding that the Forest Service's "reliance on [its] own observation of evidence of Fisher use of forest areas that have been previously treated is

1  not an abuse of discretion"); see also Vill. of Bensenville, 457 F.3d at 72 ("[J]udgments regarding

2  the development of the baseline against which alternatives would be assessed are the sorts of

3  expert analytical judgments to which courts typically defer.").

4  　　　The District Ecosystem Manager also reviewed the updated vegetation data and, along

5  with observations of the distribution of mortality in the project area, concluded that Frog's

6  prescriptions remained valid. SF_2, 14–17. This satisfies NEPA.  See Tri-Valley CAREs, 671

7  F.3d at 1130 ("Because the [agency] determined in its supplemental report that the [new

8  information] did not show a 'seriously different picture of the likely environmental harms

9  stemming from the proposed project,' we must defer to the [agency's] finding that a supplemental

10  [Revised Environmental Assessment] was not required.").

11  　　　The Court finds that Defendants have not acted arbitrarily or capriciously in declining to

12  collect new stand data and instead relying on other sources of data.

13  　　　　　b.　Whether the Forest Service Failed to Make an Informed Decision and Failed to

14  　　　　　　Disclose the Underlying Data

15  　　　SF Keeper argues that "[t]he SIR, Revised Fisher BE, and Silvicultural Review make

16  generalized conclusory assertions without providing underlying data to support those assertions.

17  The determination not to supplement the 2013 NEPA analysis fails to identify methodologies, fails

18  to present the hard data it relies upon, and fails to ensure the scientific accuracy and integrity of

19  the analysis."  Pl's Mtn at 27.

20  　　　This claim rehashes arguments raised elsewhere in SF Keeper's motion and already

21  addressed in various sections of this order. A SIR is a procedure that merely documents the

22  agency's "hard look" at new information. Friends of the Clearwater v. Dombeck,

23  222 F.3d 552, 561 (9th Cir. 2000); Laguna Greenbelt, 42 F.3d at 529; Price Rd. Neighborhood,

24  113 F.3d at 1510 ("If reevaluation reveals that an [Environmental Assessment/FONSI] remains

25  valid, no additional documentation is required."). The Forest Service's SIR and its supporting

26  materials satisfy this purpose, and the underlying data were disclosed and available to SF Keeper.

27  See, e.g., ECF No. 35, at 1 (confirming SF Keeper's receipt of the geographic-information-system

28  data supporting CBI's review and analysis of updated vegetation information); ECF No. 41-3, at 2

1   (making available-upon-request the "Forest Vegetation Simulator (FVS) data produced [in]

2   December 2016 reflecting vegetation gathered as of July 2016").

3          The Court concludes that Defendants have not acted arbitrarily or capriciously in making

4   an informed decision based on the data. See Friends of the Clearwater, 222 F.3d at 561 ("An

5   agency need only articulate a rational connection between the facts it has found and its

6   conclusions. The Forest Service has done so here, and even were we to disagree with its

7   conclusion, we could not substitute our judgment for that of the agency.") (citation omitted).

8                  c.   Whether the Forest Service Failed to Consider and Analyze Reasonably

9                       Foreseeable Future Actions That Cause Cumulative Effects

10         SF Keeper argues that "[t]he Forest Service has failed to consider and properly analyze the

11  reasonably foreseeable future actions and cumulative effects from the Spear Creek Roadside

12  Hazard Tree Mitigation Project ("Spear Creek Project"), in its cumulative effects analysis." Pl's

13  Mtn at 28.

14         After the Forest Service approved Frog in 2013, CBI published the 2016 Fisher Strategy

15  and issued guidance for analyzing cumulative disturbance from a proposed project combined with

16  other mechanical thinning projects. SF_3–4. As documented in the SIR, Defendants applied this

17  approach to determine whether Frog, at the cumulative-effects scale, would affect Fishers "in a

18  significant manner or to a significant extent not already considered." Marsh, 490 U.S. at 374.

19  The Forest Service found that it would not. SF_33–39.

20         The Spear Creek Project did not have specific acreage or prescriptions when the SIR was

21  prepared. SF_11. Nevertheless, the Forest Service found that including the Spear Creek Project at

22  the home-range scale was unnecessary because it will not overlap with hexagons affected by the

23  Frog Project and thus "will not contribute to the 13% Conservation Strategy guideline threshold

24  for mechanical treatments." SF_11. The Spear Creek Project, moreover, "would primarily fell

25  hazard trees along roads, which are considered lower quality habitat for fishers, [and] therefore

26  impacts at the fisher core area scale are expected to not be significant." SF_11, 37. Fishers already

27  avoid areas near roads, and Defendants maintain that such behavior should be encouraged. F_278

28  (reporting that vehicle collisions are a primary cause of Fisher mortality).

As acknowledged by Defendants, projects need not be final to be foreseeable in a cumulative-effects analysis. But "[t]he Forest Service need not always consider 'all proposed actions in an appropriate region before approving any of the projects.'" Selkirk Conservation All. v. Forsgren, 336 F.3d 944, 960 (9th Cir. 2003). As long as the Forest Service "provide[s] support" and "justif[ies]" the scope of its cumulative effects analysis, that decision is entitled to deference. Id. at 959–60 (upholding the Forest Service's exclusion of a road-building project from a cumulative-effects analysis because the agency "acknowledged the existence of [the project] and stated why the project should not be included"); Neighbors of Cuddy Mtn. v. Alexander, 303 F.3d 1059, 1071 (9th Cir. 2002) ("[U]nder NEPA we defer to an agency's determination of the scope of its cumulative effects review.").

Here, the Forest Service acknowledged the existence of the Spear Creek Project and explained that the Spear Creek Project was outside the scope of cumulative disturbance at issue: the hexagons in Core Area 2 that overlap the Frog project. SF_5. Thus, under CBI's guidance, Defendants have determined that mechanical thinning in the Spear Creek Project could not possibly contribute to disturbance within Frog, see SF_11, and the Forest Service need not perform analysis that will not make a difference. Ecology Ctr. v. Castaneda, 574 F.3d 652, 667 (9th Cir. 2009) ("The Forest Service need not catalogue events that are not 'truly significant to the action in question.'") (citation omitted); Selkirk, 336 F.3d at 960 ("It was not unreasonable for the Forest Service to limit its analysis to the [Bear Management Unit] in which the Stimson Project would take place."); Friends of the Wild Swan v. Weber, 767 F.3d 936, 943–44 (9th Cir. 2014) (upholding a cumulative-effects analysis that "considered the total effects on lynx analysis units touched by the project"—"[a]lthough [plaintiff] argues the agency should have also considered effects from the neighboring project because the lands are adjacent, the agency has to draw a line somewhere and has offered a reasonable justification for why it drew the line where it did").

Moreover, Defendants state that the Spear Creek Project will receive its own separate environmental review, including consideration of cumulative effects, and need not be analyzed at this juncture. Second Voss Decl. (ECF No. 47-3) Ex. D, at 3; Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1152 (9th Cir. 1998) ("Since the effects of the two sales were accounted for in the

48

West Camas Creek cumulative impacts analysis, we do not require duplication in the Miners Creek [Environmental Assessment].").

The Court finds that Defendants have not acted arbitrarily or capriciously in regards to their decisions regarding consideration of the Spear Creek Project in connection with the Frog Project.

> d. Whether the Forest Service Failed to Consider the Significance of its Action in Light of Uncertain and Unknown Risks to the Fisher

SF Keeper argues that it has met the "low standard" necessary and need not show that "significant effects will in fact occur" because there are "substantial questions" whether the Frog Project may have a significant effect on the dwindling Fisher population, in light of the Forest Service's alleged failures to back up its determinations with sufficient data and analysis, and the alleged highly uncertain and unknown risks from mortality and from logging under these circumstances. Pl's Mtn at 30-31. SF Keeper argues that Defendants must at least prepare a supplemental Environmental Assessment to make a determination as to whether they must consider preparing an EIS.

"Supplementation is not required where the agency, having taken a 'hard look' at reevaluation, 'determines that the new impacts will not be . . . significantly different from those already considered.'" Idaho Wool Growers, 816 F.3d at 1107. Whether supplementation is required "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." Marsh, 490 U.S. at 376. And Courts "must be at [their] most deferential when reviewing scientific judgments and technical analyses within the agency's expertise." Lands Council, 629 F.3d at 1074.

Defendants point out that uncertainty over recent tree mortality and its effects on the Fisher population would exist regardless of Frog. The administrative record does not demonstrate that the effects of the Frog project are "highly uncertain," which is the relevant NEPA inquiry. 40 C.F.R. § 1508.27(b)(5); Conservation Cong. v. U.S. Forest Serv., 2017 WL 661959, at *8 (E.D. Cal. Feb. 17, 2017) ("Plaintiff does not tailor its argument to the context of the Project at issue," i.e., "the degree that this Project's possible effects on the human environment are highly

uncertain."). CBI confirmed that "increasing the resilience of the remaining patches of large living conifers will be important to providing for the long term persistence of the Fisher population," and the Forest Service reasonably found "no indication" that Frog "would significantly impact or would contribute to a loss of viability of Fishers." SF_54, 9–10.

Further, while SF Keeper aggregates all proposed projects in Core Area 2 to bolster its claims of uncertainty and significance, this is not persuasive in light of the administrative record. See SF_11 ("The cumulative effects of proposed vegetation management projects in Fisher Core Area 2 would impact 4% or less of the available Fisher habitat. . . . [T]here is no indication in space or time of cumulative impacts that would have a significant effect on the viability of the Fisher within the core area, with the exception of . . . large-scale, stand replacing wildfire."). The Forest Service has and continues to address the potential cumulative effects of proposed projects in light of new information and circumstances, as appropriate. See, e.g., FAC (ECF No. 46) ¶¶ 33 (cancelling White River, Saddle, and Ice Helicopter); ECF No. 42-1 (determining that Rancheria needs supplemental NEPA review); Sequoia ForestKeeper v. Watson, E.D. Cal. Case No. 16-1865, ECF No. 17, at 2 (reducing the scale of Summit and modifying its prescriptions). This fulfills NEPA.

The Regional Forester explained that "tree mortality has not been uniform across the Sierra Nevada, such that the approaches we use may vary by locale." SF_1328. The Regional Forester continued:

> A great deal of scientific literature and professional expertise indicates that active forest management . . . is necessary to minimize the extent of drought and beetle-induced tree mortality and also to mitigate the adverse impacts from mortality that [have] already occurred. Such active management is essential to restore forests that can provide wildlife habitat and other ecological benefits, meet the needs of the American public, and be resilient to climate change. . . . Given the serious risks associated with inaction and lack of forest management, we must simultaneously study and manage the land. . . . [I]t is important to remember that the forests of the Sierra Nevada are dynamic systems, influenced by climate and disturbance agents such as fire and insects. These forests have never been, and will never be, static. . . . [N]ew information and changed circumstances are the norm and should not be viewed as a basis for halting land management in the Sierra Nevada.

SF_1329.

The Court finds that Defendants have not acted arbitrarily or capriciously in considering

the impact of the Frog Project on the Fisher.

              e.   <u>Whether the Forest Service Improperly Used its SIR and the Revised Fisher BE</u>

SF Keeper argues that at the very least, Defendants must prepare a revised Environmental Assessment for the Frog Project. SF Keeper argues that Defendants improperly used the SIR and Revised Fisher BE to supplement, revise, and repair deficiencies in the Frog Project Environmental Assessment prepared in 2013. SF Keeper also takes issue with minor adjustments in project implementation noted in the Frog Project Fuels Review.

The NEPA Forest Service Handbook 1909.15 § 18.1 (HBAR 4610) describes the function of a SIR:

> If new information or changed circumstances relating to the environmental impacts of a proposed action come to the attention of the responsible official after a decision has been made and prior to completion of the approved program or project, the responsible official should review the information carefully to determine its importance.
>
> If, after an interdisciplinary review and consideration of new information within the context of the overall program or project, the responsible official determines that a correction, supplement, or revision to an environmental document is not necessary, implementation should continue.
>
> [The agency shall] [d]ocument the result of the interdisciplinary review in the appropriate program or project file. This documentation is sometimes called a supplemental information report (SIR) and should conclude with whether or not a correction, supplement, or revision is needed, and if not, the reasons why.

<u>Klamath Siskiyou Wildlands Ctr. v. U.S. Forest Serv.</u>, 52 F. Supp. 3d 1089, 1096 (E.D. Cal. 2014)

Courts repeatedly endorse SIRs as a method for analyzing new circumstances and determining whether they reveal significant new impacts requiring formal NEPA review. <u>See Friends of the Clearwater</u>, 222 F.3d at 561 (upholding the Forest Service's preparation of "a new SIR, several Biological Assessments and Biological Evaluations, and other documents, all of which contain additional data and analyses supporting the Forest Service's conclusion" that new circumstances and information did not warrant supplemental NEPA review); <u>see also</u> <u>Price Rd. Neighborhood</u>, 113 F.3d at 1510 ("[W]hether a supplemental [Environmental Assessment] is required depends on the significance of the new impacts."). Such procedures allow the agency to document that it "carefully considered the information, evaluated its impact, and supported its

1    decision not to supplement." <u>Animal Def. Council</u>, 840 F.2d at 1439.

2         The Forest Service formatted its updated analyses to correspond with the original

3    organization presented in the 2013 Environmental Assessment—e.g., "Revisions to Frog Project

4    Fisher Biological Evaluation," "Revised Frog Project Fuels Review," and "Updated Cumulative

5    Effects." This labeling convention does not violate NEPA.

6         NEPA prohibits an agency from using a SIR to analyze information the agency "knew or

7    should have known . . . at the time it prepared the original [Environmental Assessment.]" <u>Idaho</u>

8    <u>Sporting Cong.</u>, 222 F.3d at 567. Here, the information analyzed in the SIR and its supporting

9    materials was new and unknown at the time of the Environmental Assessment, and thus the SIR

10   was appropriate. <u>Id.</u> at 566 n.3. "To require more would task the agencies with a sisyphean feat of

11   forever starting over in their environmental evaluations." <u>Price Rd. Neighborhood</u>, 113 F.3d 1505

12   at 1510.

13        Further, as for the minor adjustments noted in the Frog Project Fuels Review (SF_2–3, 14–

14   15), these adjustments are not "substantial changes in the proposed action" requiring a

15   supplemental NEPA process. 40 C.F.R. § 1502.9(c)(1)(i); <u>Price Rd. Neighborhood</u>, 113 F.3d at

16   1509 ("[A]n agency need not start the environmental assessment process anew with every change

17   in a project."). As the Forest Service explained, these adjustments will reduce the possibility of

18   adverse effects. SF_15 (explaining that adjustments would "prevent undesirable levels of mortality

19   or injury to desirable residual trees").

20        The Court finds that Defendants have not acted arbitrarily or capriciously in deciding to

21   prepare a SIR in this case.

22   **B. *Whether the Frog Project Violates NFMA***

23        The NFMA and its implementing regulations provide for forest planning and management

24   by the Forest Service on two levels: (1) forest level and (2) individual project level. <u>See generally</u>

25   16 U.S.C. § 1604; <u>see also</u> <u>Ohio Forestry Ass'n v. Sierra Club</u>, 523 U.S. 726, 729–30 (1998). "On

26   the forest level, the Forest Service develops a Land and Resource Management Plan (forest plan),

27   which consists of broad, long-term plans and objectives for the entire forest. Forest plans are

28   designed to manage forest resources by balancing the consideration of environmental and

economic factors." <u>Native Ecosystems Council</u>, 697 F.3d at 1056 (citation omitted).  The NFMA's purpose is to require that the Forest Service "provide for diversity of plant and animal communities" in managing national forests. 16 U.S.C. § 1604(g)(3)(B).242526

"After a forest plan is approved, the Forest Service implements the forest plan when approving or denying site-specific projects. Site specific actions may include resource plans, permits, contracts, and other instruments for occupancy or use of forest lands." <u>Native Ecosystems Council</u>, 697 F.3d at 1056 (citing to <u>Inland Empire Pub. Lands Council v. U.S. Forest Serv.</u>, 88 F.3d 754, 757 (9th Cir.1996)). "While NFMA requires that the proposed site-specific actions be consistent with the governing Forest Plan, the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference. The Forest Service's failure to comply with the provisions of a Forest Plan is a violation of the NFMA." <u>Native Ecosystems Council</u>, 697 F.3d at 1056.

"Agency decisions challenged under the NFMA may be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. In determining whether a decision is arbitrary or capricious, we 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" <u>Id.</u> (citations omitted).

SF Keeper argues that the Frog Project analysis fails to comply with the Sequoia Forest Plan Standard that allows no more than 30 percent canopy cover reduction within each treatment unit.  Though the SIR shows canopy changes across all project units and watersheds, SF Keeper asserts the Forest Service must show reductions on a unit-by-unit basis.

SIR is not a project approval document, and it need not detail how a project complies with each and every component of the relevant forest plan. 36 C.F.R. § 219.15(d); <u>see</u> <u>Klamath Siskiyou Wildlands Ctr. v. U.S. Forest Serv.</u>, 52 F. Supp. 3d 1089, 1096–97 (E.D. Cal. 2014) (discussing SIRs).  The SIR and its supporting materials confirm Frog was designed pursuant to the 2004 Plan Amendment, including "provisions for maintenance of canopy closure." SF_36. These materials show that reduction in canopy closure across Frog's units will be far less than 30 percent (in absolute terms) in high-value reproductive Fisher habitat, (*i.e.*, CBI habitat, or CWHR

size and density classes 4D, 5M, 5D, and 6). SF_21, 47a (ECF No. 41-4), 57. Frog's design features also ensure that canopy closure will not fall below 40 percent. SF_17. See <u>Native Ecosystems Council</u>, 697 F.3d at 1056 ("[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference.").

The Court finds that Defendants have not acted arbitrarily and capriciously in regards to the forest plan and therefore Defendants have not violated the NFMA.

### C. SF Keeper's Request for Vacatur

SF Keeper has not met its burden of proving that vacatur is warranted in this case. Such relief has the effect of an injunction, and SF Keeper therefore "must establish"—with a "clear showing"—that it is entitled to such extraordinary relief. <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20, 22 (2008). SF Keeper has failed to make the required clear showing and the Court has found that Defendants did not act arbitrarily or capriciously. Here, SF Keeper asserts that its averred harms to its members' interests and the Fisher from logging generally "are permanent," whereas the only harm from an injunction "is delay." Pl.'s Opp. 23:26. In light of the evidence in the administrative record, this Court disagrees with SF Keeper's assessment. The Forest Service has determined that current fuel loads in the project area "pose a high risk of catastrophic loss of property, natural resources[,] and possibly even life." SF_21; see <u>Sierra Nev. Forest Prot. Campaign v. Rey</u>, 573 F. Supp. 2d 1316, 1338 (E.D. Cal. 2008) ("[R]ecent fire seasons illustrate the risks from inaction as the number and severity of acres burned in wildfires continues to increase, with tragic losses to communities, their people and resources, as well as to wildland firefighters."). By implementing Frog, "surface fuels would decrease 40–80%, thereby limiting the size and severity of wildfires in the project area." SF_21; <u>see also</u> F_9 (McNally Fire, 150,000 acres), SF_10 (Cedar Fire, 29,000 acres). In turn, Frog will also promote the longevity of Fisher and other wildlife, as "[t]he greatest risk of habitat loss comes from fire." SF_16; F_227 (concluding that "large scale, stand replacing wildfires would most likely cause serious significant impacts to the [Fisher] population").

In addition, Frog is also designed to generally improve the health and resilience of trees in the project area, making them less susceptible to mortality from drought and insect attacks in the

future. SF_15, 19; Sierra Forest Legacy, 951 F. Supp. 2d at 1115 (finding that "[e]njoining . . . vegetation management work . . . will have a negative impact on the Forest Service's ability to address the intertwined threats posed by climate change, drought and bark beetles, and is thus contrary to the public interest"). This objective is all the more pressing in the wake of recent tree mortality. SF_10 (concluding that "continuing tree mortality reinforces the need for forested stands that are resilient" and Frog will "help curb the rate of mortality in the project area"). SF Keeper has not met its burden for injunctive relief. The Court therefore denies SF Keeper's request for vacatur.

## II.      MOTION TO ADMIT EXTRA-RECORD EVIDENCE AND MOTIONS TO STRIKE

### A.      Evidentiary Motions

On May 12, 2017, SF Keeper filed a motion to admit extra-record evidence ("Motion for Extra-Record Evidence") along with SF Keeper's motion for summary judgment. On May 26, 2017, Defendants filed a motion to strike SF Keeper's extra-record evidence, or in the alternative, to supplement the record with the declaration of Jeffrey R. Cordes. In return, on June 8, 2017, SF Keeper filed a motion to strike the declaration of Jeffrey R. Cordes.

### B.      Standard for Admitting Extra-Record Evidence

The judicial review provision of the APA requires consideration of "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985); see also San Luis & Delta-Mendota Water Auth., 776 F.3d at 992 ("In general, a court reviewing agency action under the APA must limit its review to the administrative record.") (citation omitted); Fence Creek Cattle Co. v. U.S. Forest Serv., 602 F.3d 1125, 1131 (9th Cir. 2010) ("Generally, judicial review of an agency decision is limited to the administrative record on which the agency based the challenged decision.") "This rule ensures that the reviewing court affords sufficient deference to the agency's action." San Luis & Delta-Mendota Water Auth., 776 F.3d at 992. "When a reviewing court

considers evidence that was not before the agency, it inevitably leads the reviewing court to substitute its judgment for that of the agency." Id. (citation omitted).

However, the Ninth Circuit has recognized certain exceptions to this rule. "[A] reviewing court may consider extra-record evidence where admission of that evidence (1) is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) is necessary to determine whether the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith." Id. (citations and internal quotations omitted).

"These exceptions are to be narrowly construed, and the party seeking to admit extra-record evidence initially bears the burden of demonstrating that a relevant exception applies." Id. at 992-93 (citation omitted). "The scope of these exceptions permitted by our precedent is constrained, so that the exception does not undermine the general rule. Were the federal courts routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that the federal courts would be proceeding, in effect, de novo rather than with the proper deference to agency processes, expertise, and decision-making." Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir. 2005) "Even if a reviewing court properly admits extra-record evidence under [these exceptions], it may not *use* the admitted extra-record evidence to determine the correctness or wisdom of the agency's decision. Such use is never permitted." San Luis & Delta-Mendota Water Auth., 776 F.3d at 993 (emphasis in original, citation omitted).

## C.       SF Keeper's Motion for Extra-Record Evidence

SF Keeper seeks to admit extra-record evidence in the form of two declarations: 1) the Second Declaration of Dr. Chad Hanson (2nd Dr. Hanson Dec.) dated May 12, 2017; and 2) the Second Declaration of Alison Sheehey (2nd Sheehey Dec.) dated May 12, 2017 (collectively "New Declarations").  SF Keeper asks the Court to make an exception to the general rule limiting review to the administrative record, arguing that the New Declarations are necessary "(1) for the Court to determine whether the Forest Service considered the 'relevant factors' before authorizing its Frog Project determination not to supplement its NEPA analysis; (2) to explain complex

subject matter; and (3) under NEPA, because the Forest Service's analysis insufficiently disclosed environmental effects and has 'otherwise swept stubborn problems or serious criticisms under the rug.'" Pl's Mtn Evid at 5.

The Court finds that SF Keeper has not met its burden of demonstrating that a relevant exception applies to allow admission of SF Keeper's extra-record evidence. First, SF Keeper's New Declarations are not necessary for the Court to determine whether the Forest Service considered the 'relevant factors' before authorizing its Frog Project determination not to supplement its NEPA analysis. "The 'relevant factors' exception only applies where supplementing the record is necessary. Where '[t]he record contains sufficient information to explain how the [agency used the information before it] and why it reached its decision,' the exception does not apply." Ctr. for Biological Diversity v. Skalski, 61 F. Supp. 3d 945, 951 (E.D. Cal. 2014), aff'd, 613 F. App'x 579 (9th Cir. 2015) (citing to Cook Inletkeeper v. U.S. EPA, 400 Fed. Appx. 239, 240–41 (9th Cir.2010)). "A court should supplement the record when the agency 'fails[s] to consider a general subject matter ..., not when specific hypotheses and/or conclusions are omitted from consideration. To hold otherwise would allow Plaintiffs to drive a truck through what is supposed to be a narrow exception to the record review rule." Ctr. for Biological Diversity, 61 F. Supp. 3d at 951–52.

Here, the Forest Service's SIR and supporting materials addressed the "general subject matter" of tree mortality and the new baseline conditions for vegetation and habitat in the Frog Project area, the overlapping Fisher home ranges, the relevant landscape ("Core Area 2"), and "post-fire logging projects in the Cedar Fire area." The Court finds that the New Declarations attack the Forest Service's scientific judgments in selecting a methodology for updating baseline vegetation and habitat. That is not a permitted use of the relevant-factors exception. See San Luis & Delta-Mendota Water Auth., 776 F.3d at 993 ("[T]he district court erred when it used the extra-record declarations as a basis for judging the wisdom of the agency's scientific analysis."); Price Rd. Neighborhood Ass'n, Inc., 113 F.3d at 1511 & n.1 (holding that the district court properly barred the plaintiffs from engaging in a "battle of the experts" with their own studies to contradict those of the agency); Conservation Cong. v. Heywood, 2015 WL 5255346, at *8 (E.D. Cal. Sept.

9, 2015) (striking "extra-record scientific opinion and argument submitted to undermine [the agency's] analyses and conclusions" (alteration in original)).  SF Keeper has not met its burden to show that the relevant-factors exception applies.

Second, SF Keeper's New Declarations are not necessary to explain complex subject matter.  "Declarations may be admissible where they aid a layperson's understanding of the basic concepts involved in the motion, and where the proponent identifies which issues 'can [only] be explained by supplemental evidence.' Supplementation is inappropriate if offered to 'suggest that [the federal agency] did not give [some information] sufficient weight.'" Ctr. for Biological Diversity, 61 F. Supp. 3d at 952 (citations omitted). Here, SF Keeper has failed to meet its burden of demonstrating that there is complex subject matter that cannot be understood through the record alone.  See id. ("Plaintiffs have not shown that any referenced declaration is necessary for understanding any complex or technical matter. Therefore, Plaintiffs' motion to supplement the administrative record is denied.")

Third, SF Keeper's New Declarations are not necessary under NEPA, because SF Keeper has not met its burden of proving that the Forest Service's analysis did not sufficiently disclose environmental effects and swept stubborn problems or serious criticisms under the rug. Instead, SF Keeper disagrees with the Forest Service's conclusions and is attempting to engage in an improper battle of the experts.  See Price Rd. Neighborhood Ass'n, Inc., 113 F.3d at 1511 & n.1 (holding that the district court properly barred the plaintiffs from engaging in a "battle of the experts" with their own studies to contradict those of the agency.)

Further, perfect clarity from the agency in its explanation for its decisions is not required under Ninth Circuit precedent.  See San Luis & Delta-Mendota Water Auth., 776 F.3d at 994 ("Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may be reasonably discerned.")  Here, even if this Court were to find that Defendants explained their decision with less than ideal clarity, this Court would find that Defendants' path can be reasonably discerned.  The overall thrust of Defendants' path is taking a long-term view of the sustainability of the forest and the danger to Fishers if their habitat is further damaged by tree mortality (such as tree mortality due to bark

58

beetles or ravaging forest fires). Therefore Defendants are willing to thin the trees in certain areas with their stated long-term goals in mind. Defendants' plan to use the Frog Project is supported by the record and is not arbitrary or capricious.

Finally, to the extent that SF Keeper relies on any other claimed exceptions, the Court finds no exception that will allow SF Keeper's New Declarations to be admitted into evidence. Therefore SF Keeper's motion to admit extra-record evidence will be denied and the Court's review is confined entirely to the administrative record. Lands Council, 395 F.3d at 1030 ("The scope of these exceptions permitted by our precedent is constrained, so that the exception does not undermine the general rule. Were the federal courts routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that the federal courts would be proceeding, in effect, de novo rather than with the proper deference to agency processes, expertise, and decision-making.")

However, even if this Court were to permit the New Declarations to be admitted into evidence, it would not change the disposition of this order. SF Keeper's New Declarations do not show that Defendants violated NEPA or NFMA and made an "arbitrary and capricious" decision, which is the Court's inquiry here. Instead, SF Keeper's New Declarations consist of inappropriate argument and insist that the Court review more recent data because SF Keeper claims that Defendant's aerial survey from July 2016 is too old. These arguments are not persuasive. See Marsh, 490 U.S. at 373 ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.") see also Vermont Yankee Nuclear Power Corp., 435 U.S. at 554–55 ("Administrative consideration of evidence . . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated . . . .")

Therefore the Court will deny SF Keeper's Motion for Extra-Record Evidence and will further deny Defendants' motion to strike as moot.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.    SF Keeper's Motion to Admit Extra-Record Evidence is DENIED (Doc. No. 48);

2.    Defendants' Motion to Strike SF Keeper's Extra-Record Evidence or, in the Alternative, to Supplement the Record with the Declaration of Jeffrey R. Cordes is DENIED as moot (Doc. No. 52);

3.    SF Keeper's Motion to Strike the Declaration of Jeffrey R. Cordes is DENIED as moot (Doc. No. 56);

4.    SF Keeper's Motion for Summary Judgment is DENIED (Doc. No. 47); and

5.    Defendants' and Defendant-Intervenor's Motions for Summary Judgment are GRANTED (Doc. Nos. 51, 53).

IT IS SO ORDERED.

Dated:   September 15, 2017          _____

                                                      SENIOR  DISTRICT  JUDGE